**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Roy Ernest DAY, Defendant-Appellant.**

**No. 72–1898.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1973.

Decided April 5, 1973.

George I. Cline, Morehead, Ky., for defendant-appellant; George I. Cline, Diederich, Cline & Wilhoit, Morehead, Ky., on brief.

Kenneth P. Glover, Office of Regional Counsel, Bureau of Alcohol, Tobacco and Firearms, Cincinnati, Ohio, for plaintiff-appellee; Eugene E. Siler, Jr., U. S. Atty., E. D. Kentucky, James Cook, Asst. U. S. Atty., E. D. Kentucky, Lexington, Ky., on brief.

Before PHILLIPS, Chief Judge, LIVELY, Circuit Judge, and YOUNG, District Judge.*

PHILLIPS, Chief Judge.

Appellant, Roy Ernest Day, was convicted in May 1972, after a jury trial, of dealing in firearms without a license. 18 U.S.C. § 922(a)(1).[1] At the same trial, he was also convicted of five counts of receiving and possessing firearms in interstate commerce. 18 U.S.C.

---

* Honorable Don J. Young, United States District Judge for the Northern District of Ohio, sitting by designation.

1. 18 U.S.C. § 922(a)(1) reads:
 "922. *Unlawful acts.*—(a) It shall be unlawful—

(1) for any person, except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms or ammunition, or in the course of such business to ship, transport, or receive any firearm or ammunition in interstate or foreign commerce."

App. § 1202(a)(2).[2] Day was sentenced to a total of five years imprisonment and fines totalling $10,000.

The evidence elicited at trial showed that, on four separate occasions in early 1970, Day sold a total of seven handguns to Special Investigator Charles H. Stone of the Alcohol, Tobacco and Firearms Division of the Treasury Department. All of the sales took place in Day's home in Morehead, Kentucky. A search warrant, obtained by Treasury agents after relating the above mentioned four sales in an affidavit to a United States Commissioner, was executed on March 20, 1970, at which time a total of 96 firearms, worth about $12,000, were seized from Day's home and adjacent house trailer. Sixty of the guns were new hand guns still in the manufacturer's original packages. There also was testimony from Day himself on cross-examination that he had sold at least one other gun to at least one other person.

During the trial, the Government called as one of its witnesses Special Investigator Sylvester Yockey of the Alcohol, Tobacco and Firearms Division. The apparent purpose of Yockey's testimony was to show that the guns possessed by Day had been manfactured outside the state of Kentucky and had moved in interstate commerce before Day possessed and received them.

Two separate and distinguishable types of testimony were offered by Yockey. First, he testified where the guns were manufactured and gave testimony, based on a document prepared by the historian of the Smith & Wesson gun manufacturing firm, as to the approximate dates of manufacture of the guns bought by the agents in the sales and seized in the search of Day's house.

The document from which Yockey was testifying listed the various models produced by Smith and Wesson and the serial numbers of the models and the periods during which they had been produced.

For example, at one point in his testimony Yockey was asked the approximate date of manufacture of a .38 Smith & Wesson model 12, serial number C951878. He replied as follows:

"The .38 Smith and Wesson model 12 was produced by Smith and Wesson from 1948 through 1968. The serial number range started at C–1 and ended at C–1,000,000. At the serial number range C–951,878 would appear to be about the first of 1968."

The defense objected to this evidence as hearsay. The objection was overruled.

After a trial recess, Yockey testified as to the exact dates of manufacture and shipment of the guns in evidence. Apparently this information was obtained by telephone during the recess from an agent in Yockey's office and was the result of the investigation conducted under Yockey's supervision. The report itself was never introduced as evidence by the Government, nor was its introduction or presence ever sought by the defense.

On appeal, Day asserts error in his conviction under 18 U.S.C. § 922(a)(1), his conviction under 18 U.S.C. App. § 1202(a)(2), and in the admissibility of certain testimony of Yockey. We examine these contentions separately.

I. 18 U.S.C. § 922(a)(1) Conviction.

Three contentions are urged upon this court regarding Day's conviction under § 922(a)(1) for engaging in the business of dealing in firearms without a license.

2. 18 U.S.C.App. § 1202(a)(2) reads:
"*1202. Receiving, possession, or transportation of firearms by certain persons—Definitions.*—(a) Any person who—
 * * * * *
 (2) has been discharged from the Armed Forces under dishonorable conditions, or

 * * * * *
and who receives, possesses, or transports in commerce or affecting commerce, after the date of enactment of this Act [June 19, 1968], any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both."

First, Day claims that Congress, in enacting the statute, intended to punish only those who deal in firearms in interstate commerce.

His reliance on United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971), to support this interpretation of the statute is misplaced. *Bass* was a decision interpreting § 1202(a)(1) of the Omnibus Crime Control and Safe Streets Act of 1968. Although convictions under one statute often accompany conviction under the other, as in this case, the statutes are not identical and, actually, are quite different.

The statute interpreted by *Bass* makes it a crime for a person in any one of five categories to "receive[s], possess[es], or transport[s] in commerce or affecting commerce, . . . any firearm . . . ." The Supreme Court, in its majority opinion announced by Mr. Justice Marshall, ruled that the phrase "in commerce or affecting commerce" modifies "receive" as well as "possess" and "transport." The Court held this as a matter of statutory construction on the basis of a reading of the statute and the *accompanying* legislative history. It is important to note that *Bass* was based on statutory construction grounds, ·not constitutional grounds.

The *Bass* decision and its analysis of § 1202(a)(1) are totally inapposite to the question before this court—the proper interpretation of § 922(a)(1). The statute at issue here provides:

"*922. Unlawful acts.*—(a) It shall be unlawful—

(1) for any person, except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms or ammunition, or in the course of such business to ship, transport, or receive any firearm or ammunition in interstate or foreign commerce."

The indictment below made no reference to any interstate nexus and Day claims this was fatal error. He asserts that Congress intended to bar only interstate unlicensed dealing in firearms. He apparently contends that the phrase "in interstate or foreign commerce" modifies "importing, manufacturing or dealing in firearms." This statute, unlike the section construed in *Bass*, is not ambiguous. The statutory language is unmistakably clear. Two separate classes of offenses are outlined. One type is the engaging in "the business of importing, manufacturing, or dealing in firearms or ammunition." The other type of proscribed activity is shipping, transporting or receiving any firearm "in interstate or foreign commerce." A license is required for both types of activity.

Section 922(a)(1) was first enacted as part of Title IV of the Omnibus Crime Control & Safe Streets Act of 1968. P.L. 90–351. It was later re-enacted as part of Title I of the Gun Control Act of 1968. P.L. 90–618. The section is the same in both Acts. Unlike the *Bass* statute, there is available in the case of § 922(a)(1) clear and convincing legislative history:

"*Section 922(a)(1).*—This paragraph proscribes any person from engaging in the business of importing, manufacturing, or dealing in firearms or ammunition (destructive device) without a license. The prohibition goes to both an unlicensed person engaging in a firearms business and such a person who, in the course of that business, ships, transports, or receives, a firearm or ammunition in interstate or foreign commerce. Thus, the paragraph makes it clear that *a license is required for an intrastate business as well as an interstate business*. The present Federal Firearms Act (15 U.S.C. 902(a)) merely prohibits the interstate or foreign shipment or receipt of firearms by a manufacturer or dealer unless he has a license." S.Rep. No. 1097, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 2114, 2202 (emphasis added).

The House report on the same section when it was later passed as part of the Gun Control Act of 1968 reflects the identical Congressional intention:

> "*Section 922(a)(1).*—This paragraph proscribes any person from engaging in the business of importing, manufacturing, or dealing in firearms or ammunition without a license. The prohibition goes to both an unlicensed person engaging in a firearms business *and such a person who, in the course of that business, ships, transports, or receives, a firearm or ammunition in interstate or foreign commerce. Thus, the paragraph makes it clear that a license is required for an intrastate business as well as an interstate business. . . . .*" H.R.Rep. No. 1577, 90th Cong., 2d Sess., 1968 U.S.Code Cong. & Admin.News, pp. 4410, 4418 (emphasis added).

There can be no doubt that the Congress intended, and through its words accomplished, the regulation of unlicensed intrastate sales of firearms. Three other circuits have been asked to impose the language of *Bass* to § 922(a)(1) and have found, as we do, that it is inapplicable. Mandina v. United States, 472 F.2d 1110 (8th Cir. 1973); United States v. Redus, 469 F.2d 185 (9th Cir. 1972); United States v. Ruisi, 460 F.2d 153 (2d Cir.), cert. denied, 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972).

■ The second argument advanced by Day regarding his § 922(a)(1) conviction is that even if Congress intended to punish unlicensed intrastate firearms sales, it was powerless to do so and was acting unconstitutionally.

■ In Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the Supreme Court analyzed anew the scope of Congressional power to regulate purely intrastate activities under the Commerce Clause. As the Court stated:

> "The Commerce Clause reaches, in the main, three categories of problems. First, the use of channels of interstate or foreign commerce which Congress deems are being misused, . . . Second, protection of the instrumentalities of interstate commerce, . . . Third, those activities affecting commerce." 402 U.S. at 150, 91 S.Ct. at 1359.

The *Perez* Court reaffirmed, under the third category of Congressional power, that Congress can constitutionally regulate a class of activities if that class has an effect on interstate commerce.

> "Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." 402 U.S. at 154, 91 S.Ct. at 1361. *See also* Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); United States v. Darby, 312 U.S. 100, 120–121, 61 S.Ct. 451, 85 L.Ed. 609 (1941). At issue in the *Perez* case was a federal act banning intrastate extortionate credit transactions. 18 U.S.C. § 891 et seq. The Supreme Court, it should be noted, repeatedly has upheld Congressional regulation of purely intrastate activity. United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942) (intrastate milk prices); Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092 (1938) (intrastate tobacco markets); Simpson v. Shepard, 230 U.S. 352, 33 S. Ct. 729, 57 L.Ed. 1511 (1913) (intrastate rail rates). As the Supreme Court wrote in the *Heart of Atlanta* case, *supra*: "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." 379 U.S. at 258, 85 S.Ct. at 358.

Just as Congress made findings that intrastate credit transactions were part of a class of activities amenable to federal regulation, the Act before this court reveals detailed findings of the interrelationship between the business of selling guns and interstate crime and inter-

state trafficking in guns. Congress found specifically that:

> "[O]nly through adequate Federal control over interstate and foreign commerce in these weapons, and *over all* persons engaging in the business of importing, manufacturing, or dealing in them, can this grave problem (interstate trafficking in firearms) be properly dealt with . . . ." P.L. 90–351, § 901(a)(3), 82 Stat. 225 (emphasis added).

*See* S.Rep. No. 1097, *supra,* at pp. 2163–66. This court is unwilling to strike down these findings. Congress need not make specific findings that there is an effect on interstate commerce by a specific activity. 402 U.S. at 156, 91 S.Ct. 1357.

There has been federal legislation regulating interstate commerce in firearms since the Federal Firearms Act, 52 Stat. 1250, was enacted in 1938. This regulation has been upheld by the courts. Cases v. United States, 131 F.2d 916 (1st Cir. 1942), cert. denied sub nom., Velazquez v. United States, 319 U.S. 770, 63 S.Ct. 1431, 87 L.Ed. 1718 (1943), rehearing denied, 324 U.S. 889, 65 S.Ct. 1010, 89 L.Ed. 1437 (1945). Congress certainly had the power to regulate intrastate gun sales which have an effect on interstate commerce in firearms. We hold § 922(a)(1) to be constitutional. *Accord, Mandina, supra,* 472 F.2d at 1114.

Day's final assertion of error regarding his § 922(a)(1) conviction is that there was insufficient evidence presented to the jury that he was "engaged in the business . . . of dealing in firearms." The District Judge in this case instructed the jury that:

> "Dealer . . . means one that is engaged in any business of selling, repairing or pawning firearms and that business is that which occupies the time, attention and labor of the man for the purpose of livelihood or profit."

This definition of what "engaged in the business" means apparently was borrowed by the District Judge from the decision in United States v. Gross, 313 F.Supp. 1330, 1333 (S.D.Ind.1970), aff'd, 451 F.2d 1355 (7th Cir. 1971). *See also* Stone v. District of Columbia, 91 U.S.App.D.C. 140, 198 F.2d 601, 603 (1952); *cf.* Kaneshiro v. United States, 445 F.2d 1266 (9th Cir.), cert. denied, 404 U.S. 992, 92 S.Ct. 537, 30 L.Ed.2d 543 (1971). There is no statutory standard defining "engaged in business." We hold that this judicial definition is an adequate reflection of the plain meaning of the phrase and approve it.

The evidence shows that four separate sales over two months were made by Day to the Government agent. Day admitted on cross-examination to at least one other sale. Ninety-six guns, including 60 in their original packages, were found in the search of the house. It should also be pointed out that the Government agent testified that each time he made one of the purchases, Day told him that he could get him any kind of gun he wanted. This evidence, we hold, was sufficient to show that Day was engaged in the business of selling guns.

II. 18 U.S.C.App. § 1202(a)(2) Conviction

Day attacks his conviction for possessing guns in violation of § 1202(a)(2). It was established at trial by uncontroverted evidence that Day was dishonorably discharged from the United States Army on April 13, 1945. His objection is not specific but apparently he contends that the punishment of one who was dishonorably discharged from the service over 25 years before possession and receipt of the firearms in question is unreasonable and violative of the concept of equal protection. He also claims that the right to bear arms is somehow fundamental and protected by the Constitution. Day also claims that Congress, in enacting § 1202(a)(2), as part of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, acted without hearings or a committee report. Lacking this, he contends there is no support for legislative findings in § 1201(1) of the Act, 18 U.S.C.App. § 1201

(1), that the possession of firearms by those who have been dishonorably discharged constitutes "a burden on commerce" or the finding in § 1201(3), 18 U.S.C.App. § 1201(3) that it is "an impediment or a threat to the exercise of free speech."

■ As to the alleged right to bear arms, Day's claim is meritless. There is no absolute constitutional right of an individual to possess a firearm. United States v. Miller, 307 U.S. 174, 178, 59 S. Ct. 816, 83 L.Ed. 1206 (1939).

■ In Katzenbach v. McClung, 379 U.S. 294, 303–304, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964), the Supreme Court set out the applicable standard under which the Congressional classification here presented must be tested:

"[W]here we find that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, our investigation is at an end."

This court, in Stevens v. United States, 440 F.2d 144, 151 (6th Cir. 1971), examined the validity of the statute forbidding convicted felons from possession of firearms. 18 U.S.C.App. § 1202(a)(1). We upheld this classification. Although Stevens is no longer good law on the statutory interpretation of § 1202(a), in light of Bass, its viability on the constitutional question of whether the Congress can forbid certain classes of people from possessing firearms is hereby reaffirmed. Other courts have also upheld the statute's bar of possession of a firearm by a convicted felon in the face of equal protection attack. United States v. Synnes, 438 F.2d 764, 771 (8th Cir. 1971), vacated on other grounds, 404 U. S. 1009, 92 S.Ct. 687, 30 L.Ed.2d 657 (1972); United States v. Rubino, 320 F.Supp. 613 (M.D.Pa.1970); United States v. Wiley, 309 F.Supp. 141 (D. Minn.1970), aff'd, 438 F.2d 773 (8th Cir. 1971), vacated on other grounds, 404 U.S. 1009, 92 S.Ct. 686, 30 L.Ed.2d 657 (1972).

■ Possession of a firearm by a person dishonorably discharged from the Armed Services, while not as dangerous, perhaps, as possession by a convicted felon, is sufficiently risky to justify Congressional regulation. As Senator Russell Long stated in the debate on the bill on the floor of the Senate:

"[T]his is a matter of saying that if he cannot be trusted to carry arms for Uncle Sam, he cannot be trusted to carry arms on the streets. This kind of person is part of the criminal element in many instances, the kind of person who does not know how to behave properly, and is a hazard to others when he possesses firearms." Stevens, supra, 440 F.2d at 155.

Although it is true, as Day contends, that there were no committee reports on § 1202(a), there was considerable debate on the floor of the Senate. This is set out at 440 F.2d 152 as an appendix to this court's Stevens opinion. We hold that the finding by Congress that possession of guns by those dishonorably discharged from the armed services is hazardous was rational. We decline to overturn it.

Day voices concern that although he was convicted under § 1202(a) for possession of these guns in 1970, his discharge under less than honorable circumstances took place 23 years before the enactment of the statute. Viewing this concern as an allegation that the statute was an ex post facto law, we reject it. United States v. McCreary, 455 F.2d 647, 648 (6th Cir. 1972). Day's assertion that the statute is somehow fatally tainted by lack of hearings or committee reports is meritless.

III. Yockey's testimony

Day objects to the admission of Special Investigator Yockey's testimony regarding the approximate dates of manufacture and then the exact dates of manufacture and of shipment in interstate commerce. It is asserted that this testimony was inadmissible hearsay. The Government seeks to justify the Yockey testimony concerning the approximate

dates of manufacture of the guns by claiming that, as an expert witness, Yockey had a right to testify from hearsay documents in the expression of his opinions. Jenkins v. United States, 113 U.S.App.D.C. 300, 307 F.2d 637 (1962) (in banc); *but see* McCormick, Law of Evidence, § 15.[3] The Government seeks to justify the admission of the testimony as to the precise dates of manufacture and shipment by reference to 28 U.S.C. § 1732, which is a codification of the business records exception to the hearsay rule. The Government claims that the investigative report was part of the business of the Alcohol, Tobacco and Firearms Division of the Treasury Department.[4]

 This court finds it unnecessary to decide the hearsay question, however, because we find the testimony objected to irrelevant and its admission not prejudicial. The apparent purpose of the testimony was to show that the guns found in the possession of Day and sold by him to the agent had moved in interstate commerce and had moved after the effective date of § 1202(a)(2), which was June 19, 1968. This was apparently thought necessary to satisfy the requirement of *Bass, supra*, that there be shown in a § 1202(a) prosecution for possession and receipt of firearms a "nexus" with interstate commerce. As the *Bass* Court stated: ". . . the Government meets its burden here if it demonstrates that the

firearm received has previously traveled in interstate commerce." 404 U.S. at 350, 92 S.Ct. at 524. If there is competent evidence to show that the guns possessed and received by the defendant were manufactured in a state outside of Kentucky, the state of possession in the present case, the conclusion is inescapable and the inference is permissible that the gun has traveled in interstate commerce before reaching the defendant. It should be noted that there is no requirement that the interstate commerce be shown to have been directly to Day. United States v. Brown, 472 F.2d 1181 (6th Cir. 1973). In this case, there was competent evidence before the jury to indicate that the guns found in appellant's possession were manufactured in Hartford, Connecticut, and Springfield, Massachusetts. Thus, the interstate nexus requirement of *Bass* was satisfied.

It should be pointed out that the testimony placing the date of manufacture and interstate commerce movement of the guns after the effective date of the statute was similarly unnecessary. There is no requirement that the guns move in interstate commerce after the effective date of the Act. United States v. Oclit, 343 F.Supp. 447 (D.Hawaii, 1972). The statute punishes the possession, which obviously took place after the Act was passed, not the interstate commerce.

Affirmed.

---

3. Although we find it unnecessary to rule on the question of whether the special investigator was actually qualified as an expert at the trial, it should be pointed out that there was no declaration of the witness as an expert and when the District Judge overruled the defense objection to Yockey's testifying from the Smith & Wesson document, he did not do so on the basis of Yockey's alleged status as an expert witness. In fact, the Government made no request at the trial to qualify Yockey as an expert witness. It is extremely doubtful whether the subject matter of Yockey's testimony, the dates of manufacture of the guns, was amenable to expert testimony.

4. The Government does not explain how § 1732, which permits introduction of a "writing or record" into evidence, would permit an oral statement of a telephoned report as evidence.