UNITED STATES of America, Plaintiff,

v.

**Jerald Jay REMINGA, Defendant.**

**No. 80–36 Cr.**

United States District Court,
W. D. Michigan, S. D.

Aug. 4, 1980.

1352

John E. Steele, Asst. U. S. Atty., Grand Rapids, Mich., for plaintiff.

David Dodge, Catchick & Dodge, Grand Rapids, Mich., for defendant.

## OPINION

ENSLEN, District Judge.

Defendant was indicted along with alleged co-conspirator, LaVern Groen, for criminal activity related to violations of the Gun Control Act of 1968, Chapter 44, Title 18 U.S.C. (Gun Control Act). When arraigned he pled not guilty. Subsequently he successfully brought a motion to sever his trial from Co-Defendant Groen and waived jury trial. The Counts relating to the Defendant, Jerald Reminga consist of the primary underlying offense of engaging in the business of dealing in firearms, § 922(a)(1) (Count II), conspiring to engage in the above business, § 371 18 U.S.C. (Count I), and use of a firearm in the commission of the felony described in Count II (§ 924(c)) (Count III).

The principal defense forwarded in this case is that Defendant's actions were connected with his gun collecting, an activity which he contends is not within the proscription of the Gun Control Act. In order to determine the contours of the Act one must look not only to its language, but also its legislative history which is a valuable aid in statutory construction.

The initial federal regulations of ordinary guns (other than gangster type weapons which were governed by the National Firearms Act, 26 U.S.C. 5801) were included in Title IV of the Omnibus Crime Control and Safe Streets Act of 1968. To assist in interpretation of Title IV Congress set forth the following explicit findings and declarations in § 901 of Public Law 90–351:

> (1) that there is a widespread traffic in firearms . . . and that existing Federal controls . . . do not adequately enable the states to control this traffic
>
> (2) that the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals, juveniles . . . narcotics addicts, mental defectives, armed groups who would supplant the functions of duly constituted public authorities and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States
>
> (3) that only through adequate Federal control over interstate and foreign commerce in these weapons, and over persons engaging in the businesses of importing, manufacturing, or dealing in them, can this grave problem be properly dealt with
>
> . . .

The purposes of this portion of the Omnibus Crime Control Act are best summarized by the Senate Report 1968 U.S.Code Cong. & Admin.News, pp. 2112, 2113:

The principal purposes of Title IV are to aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background or incompetency, and to assist law enforcement authorities in the State and their subdivisions in combating the increasing prevalence of crime in the United States.

Despite the aforementioned concerns which linked the availability of firearms generally with the extent of criminal activity, the original 1968 Act did not regulate long guns in the same fashion as handguns. As Mr. Tydings explained, and is reported at page 2248 U.S.Code Cong. & Admin. News:

> Title IV affects long guns in only two ways. First, it authorizes the Treasury Department to control imports of weapons not suitable for sporting purposes. Second, Title IV prohibits sale of any handgun or long gun in violation of the law of the state where the sale is made, or which the seller knows will be used in a felony.

The scope of federal regulation over firearms was widened with the amendments incorporated in the Gun Control Act of 1968. The principal change made by this amendment was to "impose restrictions on rifles and shotguns generally parallel to those that H.R.5037 imposed on handguns only" (1968 U.S.Code Cong. & Admin.News, pp. 4410, 4412). The rationale behind such action is self-evident—that long guns were frequent instrumentalities of crime and that regulation of their more compact counterpart, handguns, was in itself inadequate to curb crime. This was forcefully articulated in the General Statement:

> The urgent necessity for adding restrictions on transactions in long guns equivalent to those Congress [had] already applied to handguns is daily evident from recent history and mounting statistics. Of the 6,500 firearms murders in the United States each year, 30% or over 2,000 are committed with rifles or shotguns. Ninety-five percent of all law enforcement officers killed in the line of duty are victims of firearms—and one out of every four of these is killed by a rifle

or shotgun. In the Detroit riot of 1967, and again in the civil disorders of April 1968, the weapon of the sniper was the rifle. President Kennedy, Martin Luther King, Jr., Medgar Evers, and the 16 dead and 31 wounded victims of a deranged man firing from the tower of the University of Texas were all shot by rifles or shotguns. H.R.17735, as amended, is designed effectively to control the indiscriminate flow of such weapons across state borders and to assist and encourage State and local communities to adopt and enforce stricter gun control laws. (1968 U.S.Code Cong. & Admin.News, p. 4413)

With the proposed addition of long guns to the Federal regulations came concern that otherwise lawful uses of such firearms would be unduly restricted. The objections by those interested in the use of long guns for hunting, sporting activity, security, as well as the hobby of gun collecting, which is at issue in the case at bar, were anticipated and dealt with by the legislature. In particular it was stated that:

> Gun collectors could continue their hobby. If [a] firearm is an 'antique firearm' as defined in § 921(a)(15), the transaction is exempted entirely from any coverage of the bill. (The term 'firearm' as used throughout the bill does not include 'antique firearms' § 921(b)(1)). If the weapon is not an antique and is located in another State, then the collector must either be a licensed dealer, or complete the acquisition through a dealer in his home State, or in a State adjacent to his home State if the conditions of the preceding paragraph apply. (1968 U.S.Code Cong. & Admin.News, p. 4415)

The above reference to gun collecting is consistent with the general intent to accommodate the interests of safety and law enforcement with the legitimate uses of firearms. As was set forth in congressional findings and declarations of the Gun Control Act of 1968:

> The congress hereby declares that the purpose of this title is to provide support to Federal, State and local law enforcement officials in their fight against crime

and violence, and it is not the purpose of this title to place any undue or unnecessary Federal restrictions or burdens on law abiding citizens with respect to the acquisition, possession or use of firearms appropriate to the purpose of hunting, trapshooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law abiding citizens for lawful purposes, or provide for the imposition by Federal regulations of any procedures or requirements other than those reasonably necessary to implement and effectuate the provisions of this title.

After surveying the history of the Gun Control Act in a general fashion, with some particular attention to gun collecting, it is now necessary to examine the statutory framework which attempts to reconcile these potentially conflicting interests.

In order to effectuate the prohibitions and implement the record keeping, cooperation of the principle figures handling firearms was necessary. Congress therefore focused its attention on importers, manufacturers and dealers in firearms. Perhaps the most strategically important of these are the dealers, the group who is most likely to come into contact with those who are prohibited from possessing firearms.

The significance of the dealer was recognized by the Supreme Court in *Huddleston v. United States*, 415 U.S. 814, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1973) where it stated:

The principal agent of federal enforcement is the dealer. He is licensed, §§ 922(a)(1) and 923(a); he is required to keep records of 'sale . . . or other disposition', § 923(g) and he is subject to criminal penalty for disposing of a weapon, contrary to the provisions of the Act, § 924.

.    .    .    .    .

From this outline of the Act, it is apparent that the focus of the federal scheme is the federally licensed firearms dealer, at least insofar as the Act directly controls access to weapons by users. Firearms are channeled through dealers to

eliminate the mail order and the generally widespread commerce in them, and to insure that, in the course of sales or other dispositions by dealers, weapons could not be obtained by individuals whose possession of them would be contrary to the public interest. (824–825, 94 S.Ct. 1269)

Thus the primary violation of the statute, in terms of the basic underpinnings of the act, is for one to be a dealer and attempt to remain outside the Act by not becoming licensed and not fulfilling the obligations of a licensee. Consequently, the first unlawful act described is:

(1) *for any person, except* a licensed importer, licensed manufacturer, or *licensed dealer, to engage in the business* of importing, manufacturing or *dealing in firearms* or ammunition, or in the course of such business to ship, transport, or receive any firearm or ammunition in interstate or foreign commerce. (Emphasis supplied)

While key to the basic scheme of the Act, there is failure to specifically define "engage in the business of . . . dealing in firearms" and refinement of this term has been left to the judicial branch. Before the judicial constructions of this important phrase are examined it is useful to see how a "collector" is treated under the Act.

Section 921(a)(13) provides that: "The term collector means any person who acquires, holds, or disposes of firearms or ammunition as curios or relics, as the Secretary shall by regulation define, and the term 'licensed collector' means such person licensed under the provisions of this chapter." The definition of collector and dealer are not mutually exclusive. The legislative history cited above which explained that gun collecting by itself was not proscribed activity recognized the potential overlap when it stated that, "the collector must either be a licensed dealer or . . ." in order to make certain interstate sales. (1968 U.S.Code Cong. & Admin.News, p. 4415). Thus, it appears while collectors, in particular licensed collectors, are entitled to special privileges they are not exempt from the general prohibition against unlicensed

engagement in the business of dealing in firearms.

The licensed collector may perform some activities that his unlicensed counterpart may not. A licensed collector may engage in interstate activity involving purchase, transportation and sale or transfer of firearms and ammunition to non-residents. See 922(a)(2)–(6). In return the licensed collector must assume certain obligations. Under penalty of law he may not sell to those whom he has reason to believe fall within the prohibited classifications, 922(b) and (d), and he must maintain records of his transactions, 922(m).

It should be recognized that these additional privileges are limited however, to his activities directly related to his hobby. 923(b) provides, in pertinent part:

> any person desiring to be licensed as a collector shall file an application for such license with the Secretary . . . Any license granted under this subsection shall only apply to transactions in curios and relics.

While nowhere are "collectors" found in the statute except when they are licensed, even when one achieves the status of "licensed collector" one is not immunized from the requirement and proscriptions relating to dealers. A licensed collector may without fear of prosecution enter into certain interstate transactions involving curios or relics as the Secretary so defines, but otherwise the licensed collector is treated as any other "person" who is forbidden from engaging in the business of dealing in firearms without first becoming a licensed dealer. 922(a)(1).

Whereas there is no explicit exemption for collectors like himself, the Defendant argues that there is an implicit exemption. He reasons that one who falls within the definition of "collector" and whose every firearm related activity is concerned with that collection is not "engaged in the business of dealing in firearms" as the courts have interpreted that phrase.

In order to assess the merits of the Defendant's contention one is forced to examine constructions of the prohibited activity of "engag[ing] in the business of . . .

dealing in firearms". In *United States v. Day*, 476 F.2d 562 (1973) the Sixth Circuit approved of the judicial definition formulated in the Seventh Circuit. The court in *Day* agreed that:

> Dealer . . . means one that is engaged in any business of selling, repairing or pawning firearms and that business is that which occupies the time, attention and labor of the man for the purpose of livelihood or profit.

It confirmed that this construction was an "adequate reflection of the plain meaning of the phrase". (At 567)

Shortly after the *Day* decision the Sixth Circuit affirmed a lower court that found another construction to be more pertinent. The court in *United States v. Jackson*, 352 F.Supp. 672 (1972), affirmed without opinion, 480 F.2d 927 (1973), concluded that:

> anyone is engaged in the business of dealing in firearms if they have guns on hand or are ready and able to procure them, in either case for the purpose of selling some or all of them to such persons as they might from time to time conclude to accept as customers. (At 674).

The proximity in time of these decisions is evidence that the Court of Appeals viewed these approaches as legitimate alternatives rather than contradictory positions. Additional support for this conciliatory theory lies in the manner in which the court distinguished the two standards. Rather than concluding that one was the more well reasoned test, or was the approach more in line with congressional intent, the court stated that the one test was more "pertinent" to the facts in that case.

Most Circuits that have addressed the issue have approved of both formulations. Although the courts that have adopted the "profit motive" test of *Day, supra*, have not required that the "gun business" be the sole or primary business, nor that a profit be realized in any particular transaction, some courts have rejected the profit motive as too restrictive and focused on the readiness and willingness to procure weapons for sale and the holding oneself out as a dealer that was referred to in *Jackson, supra*. See

generally 32 ALR Fed. 946 et seq. No court has reversed a conviction on the grounds that the *Day* standard is erroneous.

### Engaging in the Business of Dealing in Firearms

#### Count II

The Defendant does not contest the validity of either of the standards of "engaging in the business" that the Sixth Circuit approved, but rather differs with the government as to how these constructions should be applied to him. The facts that relate to the charge of engaging in the business of dealing in firearms without a license can be summarized as follows.

During the period from February 12 to April 18, 1980, Defendant sold 12 firearms that ended up in the hands of an undercover police officer. (Exhibits 4, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19) There were three transactions all of which involved the alleged co-conspirator, Groen. In the first, the time of which is disputed, Defendant sold three guns directly to Groen (Exhibits 4, 7 and 8) for $300 which Groen in turn resold to the officer. On April 4 Defendant allowed Groen to act as middleman and sell three guns to the undercover officer for $320 at a transaction Defendant did not attend. On April 18 the Defendant went with Groen to sell six guns for $2,000. Before the deal was consummated by the payment of the $2,000 the Defendant and Groen were placed under arrest.

During this same general period the Defendant also disposed of his guns at gun shows, took three guns in on trade for an automobile which he later sold and traded, and acted as a selling agent for a licensed gun dealer promoting the gun dealer's merchandise at gun shows where dealers are prohibited from selling, in order to receive a commission in the form of a discount on his own personal future purchases.

The Defendant contends that all these transactions were performed in conjunction with his gun collection and urges the Court to consider these activities in the context of his lifelong avocation[1] of gun collecting. The Defendant argues that the standards of "engag[ing] in the *business* of . . . dealing in firearms" implicitly recognizes an exception for legitimate transactions related to the *hobby* of gun collecting. Following this thesis the Defendant establishes himself as an undisputed gun collector with a current collection of some 57 pieces which have been informally appraised as having a value of $45–60,000. The Defendant next argues that all of his transactions in guns during the time in question and indeed during his entire life have been so intimately related to the process of gun collecting that he has never engaged in the business which is prohibited by the Gun Control Act.

The Defendant established that all the pieces in his current collection are curios or relics as defined by the Secretary of Treasury pursuant to the authorization in the Act. It was undisputed that every gun he currently owns "derives a substantial part of their monetary value from the fact that they are novel, rare, bizarre or because of their association with some historical figure, period or event." 27 CFR 178.11.

The government is not impressed by this collection, however. The government argues, and the Court agrees, that collectors and dealers engaging in the business of dealing in firearms are not mutually exclusive groupings. The qualification of the Defendant's guns as curios or relics does, however, lend credence to his argument that the sales of other guns were related to his collection.

The Defendant by way of many witnesses explained the "accepted" practice of gun collectors in Western Michigan. Desirable guns are often acquired by way of barter. In this process several less desirable guns may be given in order to obtain the rarer or more valuable gun. Often the less desirable guns which are traded are not curios or relics as defined by the Secretary, and may

---

1. "Avocation" is particularly descriptive here because it connotes both hobby and occupation. Webster's New Collegiate Dictionary: 1. archaic—diversion, distraction, 2. a subordinate occupation pursued in addition to one's vocation especially for enjoyment; HOBBY 3. customary employment; VOCATION.

not be recognized as a collector gun even to one with a modest collection. This process is argued to be necessary to the collector who lacks independent wealth to pursue his collection. Another characteristic of acquiring, in which almost the reverse occurs, is where the seller prefers to sell in lots, thereby avoiding multiple transactions. This requires the collector to purchase several unwanted guns in order to obtain the prized piece. Of course he could purchase only the desired piece at the full price or substantially the full asking price of the lot, but this is deemed economically unfeasible. Therefore the prudent collector buys the whole lot and "separates the wheat from the chaff" by purchasing "in bulk" and reselling the unwanted items or using them to trade for later desired items.

The above is a description of the "typical" mode of acquisition and an explanation of how non-collectibles are handled even by the purist collector. The process is repeated upon disposition. When a collector desires to liquidate all or a portion of his collection he will often be "forced" (by economic considerations) to take non-collectors in trade for his more valuable guns and then dispose of these common and more readily marketable guns himself in order to realize the money out of his collection.

The Defendant argues that the same legislators who drew up the regulation concerning dealing also recognized gun collecting as a legitimate activity involving firearms. He argues that once collecting is allowed, sales of related trade guns must a fortiori be allowed. The problem with such an approach is that the Defendant does not recognize that while collecting is allowed all methods of collecting are not necessarily permissible. (Certainly the Defendant would not argue that collectors' handguns need not be registered.)

The government sees the Defendant's position as untenable. It argues that such an exception would defeat the purpose of the Act and amount to absolute immunity to anyone that could establish that he was a collector of relics and curios. The government also takes the position that mere trade in curios and relics alone may consti-tute a violation of the Act citing 27 CFR 178.41(d):

> The collector license provided by this part shall only apply to transactions in acquiring, holding or disposing of curios and relics. A collector's license does not authorize the collector to engage in a business required to be licensed under the Act or this part. Therefore if the acquisitions and dispositions of curios and relics bring the collector within the definition of a manufacturer, importer or dealer under this part he shall qualify as such.

■ Along this vein the government would argue that the mere fact that the Defendant sold some 70 collectors, in the last three years, as defined by the Secretary's regulations, would place the Defendant in the category of engaging in the business. The Court need not reach this conclusion however in order to find the Defendant guilty of violating 922(a)(1). The primary transactions in issue did not constitute direct sales, purchases or trades of collectors items. None of the guns that were acquired by the undercover agent were of the quality of the Defendant's collection, and only a few arguably derive a substantial value from their collector nature. Since these transactions are one step removed from the actual collector item, the Court's conclusion in this case need reach no further.

Not only has Defendant admittedly handled between 200–300 common guns in order to liquidate a portion of his collection in order to make payments of some $25,000 on a new home in Grand Haven, but he also dealt in non-collectors in other contexts. When he traded his car for three guns and some cash he sold one or two of the guns within a short period and traded the other(s). Here Defendant acknowledged that he took the guns with the intention of selling them to receive what he needed to realize from the car stating:

> Rather than paying me for money for that car he gave me guns and I figured what I had to have for the car and figured OK I'll sell the guns for what I need for it. (4/18 Tr. at 5)

And regarding the one gun that he received in trade, a Model 12 Winchester:

I didn't want the gun. I purely wanted to get rid of it. It was not a collector gun and I didn't want it, it was reblued. I think I sold the gun a week after I got it or maybe two weeks at the Saginaw guns Show . . . at 7.

Additionally, some of his relations with collector guns were not connected with his own gun collection. The Defendant admitted to taking collectors from Rylees, a licensed gun shop, to sell at gun shows in order to earn a commission.

Ah you know if they have a gun there that they have taken a high priced used gun that they have taken in on trade and they can't seem to sell it and if it looks like a gun that somebody at a gun show would buy because it's a collector gun I would say, if they would ask me say, do you think you could sell that at a gun, I would say Yeah I think I can, I think it would sell at a gun show where it isn't selling here in the store. Now what do I get out of the thing. Ah, the next gun I buy for myself they may give me a better price on the gun than they would if I was just a stranger. Now I guess technically that's not right. (4/18 Tr. p. 10)

Recognition of these additional involvements in firearm trade place the three particular transactions in question in proper perspective.

With eye on the "profit motive" test of *Day, supra,* the Defendant argues that he did not make money on the guns, and that he merely broke even in disposing of the non-collectibles. When asked if he ever lost money on the guns he stated no and attributed this to appreciation of goods in inflationary times, desiring to distinguish this "appreciation" from "profit".

Although it may be true that much of his gain was derived from appreciation rather than the profit margin usually associated with high turnover items, it is also clear that he could realize more by trading a collector for several common guns rather than selling the collector outright. If the transactions are broken down it becomes apparent that he was profiting by selling the non-collectors. An example will clarify this point. Exhibit 15, an LC Smith double barrel shotgun with an extra set of barrels, was estimated to be worth $900 and yet Groen, who cannot be expected to take a loss on an item he was attempting to sell for Reminga, offered it to the undercover officer for $500. Either one of two circumstances exist. One, the transaction is recognized to be illegal thereby causing the item to be sold at less than its fair market value, or two, the gun has been overvalued. While both factors could enter in, it is the Court's belief that the gun was overvalued. What the appraiser was really stating was that guns like that particular model have sold for as high as $900, but he knows of no one who would pay that much for the gun now although he knows people with $900 and who would like to have that particular model. Instead of selling the gun for $500, which he could find a buyer for, and what is truly the fair *market* value, the Defendant may have traded the gun for six common guns each of which could be in turn sold for $150, although a gun store would only give $80–100 for them. The Defendant states he is only "washing out" on the six common guns since he traded a gun "worth" $900 for them, whereas in fact he is making at least $50 on each of the guns he resells. (The same is true if he receives a $150 trade in allowance for the guns.) To acquire this "profit" the Defendant accepted transactions involving non-collector guns.

Once it is established that the Defendant had the purpose of livelihood or profit in selling of non-collectors the only remaining element is whether this is an activity "which occupies the time, attention and labor" *Day, supra.* Since the courts have recognized that this business need not be one's sole or primary occupation the dispute as to how much of Defendant's time was engaged in selling guns, as opposed to fixing up the home in Grand Haven and collecting antiques, is not material. The Court is aware that Defendant has not been formally employed after 1977 and that he has spent a considerable amount of time at gun shows, gun stores, and other locations where sales of guns occur. No more need be shown.

Since the more restrictive of the two tests for engaging in the business of dealing in firearms, the profit motive test of *Day, supra,* has been met, the Court need not examine whether the Defendant was holding himself out as one who could procure firearms.

The only remaining element to be established where it is shown that one has been engaged in the business of selling firearms is that such activity was done without having first obtained a license. Government Exhibit 1 amply demonstrates Defendant was not licensed and therefore has violated 922(a)(1).

### Conspiracy Count I

In addition to being charged with the underlying offense of engaging in the business of dealing in firearms without a license, contrary to the Gun Control Act of 1968, the Defendant was indicted in Count I of conspiring with Groen to commit this offense. The facial validity of this additional charge stems from the circumstances of the April 18, 1980 sale. The undercover officer testified to being called by Groen and arrangements made for him to purchase $2,000 worth of guns with the transaction to occur in a bar in Caledonia, Michigan. Upon arriving at this location the officer met Groen, who he had purchased guns from on two prior occasions, along with the Defendant, who he met for the first time. After exchanging greetings Groen and the officer discussed the mode of examining the firearms. It was suggested that they go down a dead end street close to the bar. Groen urged the Defendant to accompany them and the Defendant somewhat reluctantly agreed. During the "buy-bust" the Defendant remained in the car while Groen negotiated with the officer and displayed the various firearms. It was not until after the arrest that the officer discovered that the firearms belonged to the Defendant rather than Groen.

The government contends that it has established at trial that the Defendant agreed to sell or consign guns to Groen, that Groen was to effect sales to customers and it was to that end Defendant supplied Groen with guns. The government argues that this satisfies the requirements of "agreement" and "overt act" as has been variously stated by the Sixth Circuit. See generally *U. S. v. Williams,* 503 F.2d 50 (CA 6 1974) and *U. S. v. Thompson,* 533 F.2d 1006 (CA 6 1976).

To buttress its circumstantial showing of agreement the government traces the firearms sold to the undercover agent on March 31 and April 4 to the Defendant. In conjunction with this pattern of dealing the government presents Defendant's rendition of Groen's proposition to enter into such a conspiracy. After being arrested the Defendant had a tape recorded conversation with Officer Gates where he stated:

Well, I know Vern Groen sells produce and ah in the summer time. But this, when I sold him those three guns he says you know it you'll bring me cheap guns he says I don't want expensive guns, collectors guns. He says I want just cheap stuff he said not really over $125 a gun. He said, I can (sell) all those guns you got and I said Vern I don't have that kind of guns and I don't want to trade collectors for that kind of stuff. He said, well I can sell them for, he says if you bring down here and if you can take em on trade he says I can sell them. (4/18 Tr. at 8)

The government makes a persuasive circumstantial argument that the "three gun" sale referred to above along with the offer occurred on March 31, whereas the Defendant states that it occurred on April 4. In the final analysis, the precise date is not paramount for the central issue is whether the Defendant "accepted" this "offer". In finding acceptance the government points to the six gun transaction on April 18 subsequent to the offer.

It is undisputed that the Defendant and Groen acted together in an agreed upon fashion in the sale of guns to the undercover officer on April 18. The question remains, however, as to the extent of the agreement—whether the Defendant conspired to engage in the business of dealing in firearms which requires more than isolated transactions. Even assuming that the offer was made on March 31, there are varying inferences that can be drawn from

the following actions. It is questionable whether Reminga intended to act in concert with Groen for any length of time or for any number of transactions. During the course of his testimony Defendant has admitted to fairly frequent dealings with guns and, although he has placed some firearms on consignment with commercial gun stores, he did not have much difficulty in selling guns and so could have continued to act on his own. While there remains no reasonable doubt that the Defendant conspired to sell guns, although not "cheap" $125 guns, on April 18, and an agreement may be assumed for April 4 there still remains some doubt as to what the extent of their agreement was.

Was the agreement to sell all the non-collectors that the Defendant acquired, was the agreement only to sell nine guns that were actually sold on April 4 and April 18, or was the Defendant making a fair representation when he stated that the meetings with Groen were unplanned and isolated agreements concerning separate transactions were part of no scheme to merchandise guns jointly?

While the above uncertainty create some marginal doubt as to the substance of the agreement between the Defendant and Groen there is another consideration raised obliquely by the Defendant that is a greater cause of concern and makes unnecessary a conclusion regarding the agreement. In his presentation of the defense the Defendant generally questioned the type of intent required citing *Morisette v. U. S.*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Additionally, in his post trial brief, Defendant contends that the inclusion of "knowingly" in the three counts of the indictment, where not required by statute, constituted a "constructive amendment" or "variance".

The holding of *Morisette, supra*, is inapposite to the case before this Court. The Gun Control Act unlike the larceny statute, which was the subject of the prior case, did not codify a common law offense which was a specific intent crime, and Congress has been presumed to have intended that liability exist without such intent in firearms regulations. As the court stated in *U. S. v. Ruisi*, 460 F.2d 153 (CA 2 1972):

There is no constitutional requirement that scienter be established as an element of the crime, nor will Congress be presumed from silence to have intended to make it so when the purpose of the statute is to regulate objects or activities which in and of themselves are dangerous or harmful. (At 156)

The objections to the indictment, as viewed in context of the proofs and elements of the offense, is also without merit. Rather than constituting a constructive amendment or variance "knowingly" is merely an innocuous surplusage in the indictment.

The Government need not prove everything in an indictment but only so much thereof as establishes a violation of the statute. Unnecessary allegations are "surplusages" and can be ignored. *Gambill v. U. S.*, 276 F.2d 180, 181 (CA 6 1960).

In a similar case in which a violation of the National Firearms Act was charged the court found the indictment to be substantially correct and void of reversible error. The fact that the indictment referred to willful possession adds little to the defendant's claim. First, under the case law, the act of possession must be willing and knowing . . . Second, even if the language is intended to allege a knowing violation of the Act, the case law is clear that such an allegation is mere surplusage and need not be proved. *Milentz v. U. S.*, 446 F.2d 111, 114 (CA 6 1971).

The Defendant's objections along the area of intent have raised in the Court's mind, however, a fundamental question concerning the offense of conspiracy in this setting. The concern involves the justifications of having conspiracy as a separate substantive offense when the underlying crime is not inherently blameworthy and is solely a creature of the legislature.

Other courts, having similar reluctance to find conspiracy liability in these circumstances, developed what has become known as the "corrupt motive" doctrine. This doctrine, originating with *People v. Powell*, 63 N.Y. 88 (1875), was adopted by our Circuit

in *Landen v. United States,* 299 F. 75 (CA 6 1924). In *Landen* the statute in question involved the dispensation of intoxicating liquor. In rejecting the conspiracy count the court stated:

> It is settled that with regard to criminal prosecutions for those acts which are not mala in se, but which through legislative exercise of the police power have become mala prohibita, no conscious intent to break the law is essential . . . When, however, the prosecution is for conspiracy, the text-books and elementary discussions seem to agree that there must be a 'corrupt intent', which is interpreted to be the mens rea, the conscious and intentional purpose to break the law.
>
> .   .   .

The court then goes on to state the facts which preclude a conclusion that the defendant had a "corrupt intent" to violate the law.

Although the courts have not elucidated their rationale for the corrupt motive doctrine, commentators have provided reasoning in its support. In their treatise *Criminal Law,* LaFave and Scott state:

> Taking note of the fact that conspiracy reaches further back than attempt to a point where immediate achievement of the objective is less likely, it is argued that 'the danger arising from the mere act of agreement is less when the defendants are actuated by no 'criminal intent', and may be expected to desist if, before committing the act, they discover its illegality.' Similarly, it has been suggested that a group which combines to achieve an objective which is not inherently wrong and not known by them to be illegal poses no threat of continued wrongdoing because they are unlikely to undertake similar schemes after learning that the objective is against the law. (At 469–470)

■ This reasoning appears particularly valid, where, as here, the Defendant will nevertheless be held liable for consummation of the underlying offense. Though, guilty of unlawfully dealing in firearms, in the absence of showing an intentional violation of the Gun Control Act, there appears to be no reason to hold the Defendant liable for the separate offense of conspiracy.

The Defendant's Motion for Acquittal as to Count I which was taken under advisement at the close of the government's case is therefore granted.

■ Although little reliance has been placed on the alleged co-conspirator's statements, especially as to counts other than the conspiracy charge these statements which were heretofore conditionally admitted are now excluded from evidence. Although Co-Defendant's acquittal subsequent to trial will not require his statements to be inadmissible, exclusion is required when upon the close of the government's case a conspiracy cannot be found. See *U. S. v. Ratcliffe,* 550 F.2d 431, 433 (CA 9 1976); *U. S. v. Davis,* 578 F.2d 277, 281 (CA 10 1978).

### Count III Use of a Firearm in the Commission of a Felony

When the Defendant and Groen left in the latter's car to meet the undercover officer at the end of the street, there were six long guns in the trunk and one Ithaca 12 gauge pump shotgun in the car. The Ithaca shotgun was unloaded, but only partially encased, the butt- end being unzipped. The gun was lying in the Mark IV Lincoln between the passenger and driver seat with the muzzle pointing to the rear of the car. In the ashtray were three 12 gauge shotgun shells with the metal end facing up.

The government's argument is that the gun was kept in the car for security purposes because the two Defendants were somewhat suspicious of the purchaser and that such positioning of the gun constituted a use of the firearm in the commission of the felony of engaging in the business of dealing in firearms without proper licensing.

One of the officers involved in the arrest testified that the Defendant, upon being questioned about the presence of the shotgun, stated: "(It was) there in case we had trouble with the deal." Defendant initially denied making this statement and said that

he had not even spoken with that officer at the scene and yet on cross examination stated:

> I told Mr. Gantenbein if he will remember that I asked Vern Groen, I said: 'Is this guy all right that you are going up to see?' I thought he might be going to steal the guns from Groen. Groen says: 'Don't worry.' And he reached under the seat where he kept the shells, and he put three shells in the ashtray. And what he meant by that, I don't really know because I don't think he meant a thing by that.
>
> (After making this statement he still maintained that he had not said 'the gun was there in case anything went wrong with the deal' and tried to distinguish the two statements.)

The Defendant's contention is that Groen's statement including the act of placing the shells in the ashtray was only bluster—that Groen was only maintaining his "tough guy" image. Defendant's alternative argument is that if Groen was seriously contemplating actually using the gun that he was not aware of it, nor did Defendant aid and abet such use.

The preliminary consideration is whether the Ithaca shotgun was "used to commit (a) felony". It has been established that a felony was committed and it has not been disputed that the firearm accompanied the Defendant and Groen during the commission of a felony. It should be noted however that this would be true in all Gun Control Act violations of this nature. In order for one to be liable under 924(c)(2) there must be a showing that the gun was "unlawfully" carried. The government chose not to proceed under this subsection and instead charged the Defendant with "use" of a firearm *to commit* a felony. 924(c)(1).

The language of the statute, distinguishing "unlawful carrying" and "use" would seem to require more than the alleged positioning of the gun for potential security purposes for there to be a violation of the "use" subsection. Although the gun need not be "a but for" cause instrumentality it would seem that the "use" of the gun must materially advance the commission of the crime.

In support of its contention that a "security use" is adequate the government cites *U. S. v. Grant*, 545 F.2d 1309 (CA 2 1976). In that case the defendant was convicted of possession of cocaine with intent to distribute and five counts of using a firearm to commit a felony. To secure the large amounts of cocaine the defendant stored on the premises he installed a television monitoring system, metal reinforced doors and had five loaded weapons, three handguns and two rifles, strategically placed around the rooms. The court stated:

> Grant used the guns as part of a tight security operation to protect large amounts of cocaine and hence to commit the felony of possessing cocaine with the intent to distribute it.
>
> .   .   .   .   .
>
> Anyone who entered the club was put on notice of the extraordinary security arrangements. The guns which were found in the rooms amounted to a small arsenal, they were loaded and they were strategically located . . . We recently took judicial notice based on experience on the trial and appellate benches that substantial dealers in narcotics keep firearms on their premises as tools of the trade . . .

While the case at bar can be factually distinguished in that the shotgun was unloaded, and the undercover officer had no notice of the security measure the *Grant* court also made an interesting comment regarding what constituted "use" of a firearm:

> The government concedes, and we agree, that Section 924(c)(1) was not intended to apply to either the mere carrying of a firearm or the carrying of a firearm with intent to use it during commission of a felony.

A subsequent case involving the "inactive" use of a firearm to commit the felony of bankrobbery sheds light on what factors must be present to sustain the use offense. In *U. S. v. Moore*, 580 F.2d 360 (CA 9 1978) the defendant had been arrested outside the

bank when he and another approached the bank wearing gloves and a ski mask, carrying pillowcase, with a loaded pistol concealed in his waistband. In finding the defendant guilty of the "use" offense the court stated:

> The fact that Moore never had an opportunity to brandish or discharge his gun does not mean that he did not 'use' it. Moore attempted to rob a bank and possession of a *loaded* gun was an *integral part of the attempt.* Moore 'used' his gun, much as he used the gloves and ski mask. These items *increased the likelihood of success; without them he probably would not have sallied forth.*

In distinguishing their case from *Grant, supra,* the court in *Moore, supra,* stated that: "Possession of the weapon was not unrelated, or tangentially related, to the principal offense".

In viewing the "sparse" legislative history of 924(c) the *Moore* court finds that it:

> . . . demonstrate(s) only that Congress did not intend to penalize one who happens to have a gun in his possession when he commits an entirely unrelated offense. This is not such a case. The gun was a tool of Moore's trade of robbing banks, and it was being used in that trade.

■ The difficult question of whether "use of firearm to commit a felony" could be found under the facts in this case, where an unloaded gun, that was purportedly segregated as Groen's commission for arranging the sale, was left in the car while Groen made the deal and the Defendant made no movement toward the shotgun, need not be reached. The additional hurdle of connecting the positioning of the gun with the Defendant was not made to this Court's satisfaction.

Assuming that an underlying felony was committed and that a firearm was used to commit that felony, the use must still be linked with the Defendant. It was not contested that Groen was the individual who placed the shells in the ashtray, nor was it disputed that the Defendant made no attempt to load the gun, take it out of the case or otherwise ready the gun for fire

when he saw Groen held at gun point by the officer confirming his fears that they would be robbed of his valuable merchandise.

■ The government presents several theories of liability. If a conspiracy had been established the Defendant could have been held liable for his coconspirator's acts in furtherance of the conspiracy. If it had been shown that Reminga had positioned the gun in Groen's car either loaded or with the ammunition accessible or implicitly agreed to use the gun the Defendant could have been found guilty as the principal. However, since Defendant did not reach for the gun when Groen was apparently imperilled, the court has a reasonable doubt as to the Defendant having agreed to use the gun to protect Groen or the cargo. Under the facts as they are now viewed the only remaining theory is that the Defendant was an accessory to Groen's use of the shotgun. The government argues and the Court agrees that aiding and abetting need not be specifically charged in an indictment since the statute covering such accessories, 18 U.S.C. § 2, is embodied in all federal indictments. See *U. S. v. Maselli,* 534 F.2d 1197, 1200 (CA 6 1976).

Defendant, as well as the government, directs the Court's attention toward the "classic" formulation of aiding and abetting by Judge L. Hand:

> In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed. As quoted approvingly by *U. S. v. Tarr,* 589 F.2d 55 (CA 6 1978).

The Court in *Tarr* goes on to emphasize that the "sharing of criminal intent" of the principal is the key element, with neither "mere association" nor "mere presence at the scene and knowledge that a crime was to be committed" sufficient.

The government bases its accessory theory on the fact that the Defendant was suspicious about the potential buyer. Defendant's own testimony has him asking "Is

this guy all right that you are going up to see?" thinking "he might be going to steal the guns from Groen" and that this comment led to Groen reaching under the seat to retrieve the shells stating "Don't worry". Furthermore, Reminga returned to the car after having met the agent in the bar with Groen and then stayed in the car with the shotgun when Groen transacted the "business" with the officer.

The Defendant counters with the argument that at most he was a knowing spectator and that such presence is insufficient to support a finding that he was an aider and abettor. Additionally the Defendant asks the Court to consider (based on state precedent, holding such to be relevant), the "fact" that conviction under Count III carries a mandatory prison term. The premise of the Defendant's "mercy" argument is faulty however. As can be seen from the language of the statute only upon second violations is the Court prohibited from giving probationary or suspended sentences if it deems them advisable.

Considering the limited involvement of the Defendant with respect to the Ithaca shotgun that was kept in Groen's car, the Court finds reasonable doubt that he entertained the requisite intent or participated in the "use" of this gun to commit a felony, and therefore finds him not guilty of Count III.

In summary, the facts established and the conclusions drawn require the Court to find the Defendant guilty as charged in the indictment as to Count II (engaging in the business of dealing in firearms), but not guilty as to Counts I and III (conspiracy and use of a firearm to commit a felony).