**UNITED STATES of America**

**v.**

**Roscoe C. JACKSON.**

**No. 11881.**

United States District Court,
S. D. Ohio, W. D.

Nov. 9, 1972.

Grayce M. Ruehlman, Asst. U. S. Atty., Cincinnati, Ohio, for plaintiff.

Arthur Clark, Jr., Cincinnati, Ohio, for defendant.

## OPINION

PORTER, District Judge:

Defendant was indicted June 2, 1972, for knowingly engaging in the business of dealing in firearms without being licensed to do so under the provisions of Chapter 44, Title 18 U.S.C. (Gun Control Act). When arraigned, he pleaded not guilty, waived a jury trial, and the case was tried to the Court.

The main question comes from defendant's contention that the pertinent section (§ 922(a)(1), Title 18 U.S.C.) is unconstitutionally vague. It provides:

"922 Unlawful acts

(a) It shall be unlawful * * *

(1) for any person, except a . . . licensed dealer, to engage in the business of . . . dealing in firearms or ammunition, . . ."

Section 926 provides the Secretary may prescribe regulations. One such regulation gives the meaning of "dealer" as:

" . . . any person engaged in the business of selling firearms or ammunition at wholesale or retail; any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms; or any person who is a pawnbroker." 26 C.F.R. § 178.11.

The defendant contends that due to the lack of interpretative guidelines within the statute and the fact that the Courts have given varying definitions to the phrase "engaged in business," the statute runs afoul of the requirement that a statute not forbid or require conduct in terms so indefinite that men of ordinary intelligence must necessarily guess at its meaning and differ as to its application. Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939); United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

This same question arose in United States v. Gross, 451 F.2d 1355 (7 Cir., 1971). There the Court held § 922(a) (1) was not impermissibly vague, noting at page 1357:

"There appears to be little doubt that 'dealer' means anyone who is engaged in any business of selling firearms, and that 'business' is that which occupies time, attention and labor for the purpose of livelihood or profit. Stone v. District of Columbia, 91 U.S.App. D.C. 140, 198 F.2d 601, 603 (1952)."

Stone v. District of Columbia, *supra,* was a tax case dealing with a tax placed on unincorporated business for the privilege of doing business within the District of Columbia. The issue involved was whether the petitioner was engaged in an unincorporated business within the meaning of the District of Columbia Revenue Act of 1957. We must question whether a definition of "business" in the field of taxation should be accepted in legislation to assist crime control by preventing firearm bootlegging. We consider more pertinent a line of cases de-

cided by the Court of Appeals for the Sixth Circuit commencing with Bailey v. United States, 259 F. 88 (6 Cir., 1919), in which the Court said that in order to find that a defendant was *carrying on the business* of a liquor dealer, for the purpose of § 3242 R.S., U.S.Comp.Stat. 1916, it must be found:

" . . . that the defendant either had liquor on hand, or was ready and able to procure it, in either case with the purpose of selling some or all of it to such persons as he might from time to time find or conclude to accept as customers."

See also Wilson v. United States 149 F.2d 780 (6 Cir., 1945); United States v. Lawson, 266 F.2d 607 (6 Cir., 1959) (construing 26 U.S.C. § 5112(a) I.R.C. 1954).

█ In view of the purpose of the Gun Control Act of 1968 to assist crime control, we conclude that anyone is engaged in the business of dealing in firearms if they have guns on hand or are ready and able to procure them, in either case for the purpose of selling some or all of them to such persons as they might from time to time conclude to accept as customers.

█ Furthermore, we conclude that a person of ordinary intelligence would have little difficulty in ascertaining from § 922(a)(1) that if he has firearms on hand with the purpose of selling some or all of them to such persons as he might from time to time conclude to accept as customers, that conduct is prohibited by the statute unless he is licensed. Hence, we conclude that § 922(a)(1) of Title 18 U.S.C. is not unconstitutionally vague.

It should also be noted that the Act is constitutional in that it does not involve any violation of the self-incrimination clause of the Fifth Amendment. United States v. Freed, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). (*Freed* was a possession case.)

█ Next, no specific intent or knowledge is required. United States v.

Freed, *supra*, at 607, 91 S.Ct. 1112, 28 L.Ed.2d 356. Also unlicensed intrastate dealing in firearms is punishable under 18 U.S.C. § 922(a)(1) without any allegation or proof that interstate or foreign commerce was involved or in any way affected. United States v. Ruisi, 460 F.2d 153 (2 Cir., 1972), cert. den. 409 U.S. 914, 93 S.Ct. 234, 34 L.Ed.2d 176 (1972).

There are several parts of the legislative history which are of interest. For instance, as to § 921(a)(11):

"The term 'dealer' is defined in somewhat the same manner as that definition appears in present law (15 U.S.C. 901(5))." U.S.Code, Cong. & Admin. News, 90th Cong., 2d Sess., 1968, Vol. 2, p. 2201.

See also, Vol. 3, p. 4417.

"The subject legislation responds to widespread national concern that existing Federal control over the sale and shipment of firearms [across] State lines is grossly inadequate.

"Handguns, rifles, and shotguns have been the chosen means to execute three-quarters of a million people in the United States since 1900. The use of firearms in violent crimes continues to increase today. Statistics indicate that 50 lives are destroyed by firearms each day. In the 13 months ending in September 1967 guns were involved in more than 6,500 murders, 10,000 suicides, 2,600 accidental deaths, 43,500 aggravated assaults, and 50,000 robberies. No civilized society can ignore the malignancy which this senseless slaughter reflects." *Id.*, p. 4413.

"Section 922(a)(1).—This paragraph proscribes any person from engaging in the business of importing, manufacturing, or dealing in firearms or ammunition without a license. The prohibition goes to both an unlicensed person engaging in a firearms business and such a person who, in the course of that business, ships, transports, or receives, a firearm or am-

munition in interstate or foreign commerce. Thus, the paragraph makes it clear that a license is required for an intrastate business as well as interstate business. This provision is the same as existing law." *Id.,* p. 4418.
. . . . Intrastate dealers are subject to the annual $10 fee. *Id.,* at p. 4422.

Also:

". . . gun collectors [can] continue their hobby. If the firearm is an 'antique firearm' as defined in section 921(a)(15), the transaction is exempted entirely from any coverage of the bill . . . ." *Id.,* at 4415.

## FACTS

On September 12, 1971, Lewis Wolf, Special Agent for the Bureau of Alcohol, Tobacco and Firearms since 1970, who knows the defendant, saw him at the Fayette County Fairgrounds, Washington, C.H., Ohio, at a table with about 40 guns, half of which were long and half handguns. He observed two purchases and saw many people look at the guns, handle them, etc. The following day Wolf checked and determined that the defendant was not a licensed dealer, though the record showed defendant did have a license for the period from October, 1968 to October, 1969. The defendant was alerted to the provisions of the law by mailing him copies of the applicable statutes and regulations along with the other pertinent material concerning Title I, Gun Control Act of 1968. This was sent by Registered Mail. The return receipt was dated September 14, 1971.

On October 9 Wolf saw the defendant at the same place with 39 firearms, 19 long, with the defendant behind the table, and he saw and heard him say: "I've seen them come in and clean off all the tables."

Wolf saw what appeared to be sales, looked at the table, priced the guns, and bought one for $50 after showing his identification and satisfying the defendant that he was a resident of Ohio.

The defendant's gun display included a glass display case and the whole display was at the same location the defendant had the previous month. The glass display case contained 19 handguns and one handgun was lying on top of the case. Wolf overheard defendant quote a customer the price of $95 for the handgun on top of the glass case. It was purchased by the customer and the undercover agent did not observe any paper work being completed, that is, the required Treasury Dept. Form 4473, Firearms Transaction Record. The defendant was then observed discussing the sale of long guns with another prospective customer, and later in the day the undercover officer approached the defendant at a time when the defendant was discussing the sale of a pistol to a prospective customer and overheard the defendant quote a price of $110 and say that this type of firearm costs the dealer $95, and that the dealer would have to have a profit of $20 to $30. Then, on the next day, October 10, 1971, undercover agents saw the defendant display a number of handguns and long guns. The defendant was seen to display one handgun to a prospective customer and one undercover agent approached the defendant and inquired about the purchase of a .25 caliber pistol. The defendant stated he did not have one at the time but he sometimes handled them. The officer asked if he could get one. The defendant responded by saying that he could and that the officer should see him at the next gun show and he would have one.

Finally, on January 9, 1972, the undercover agents visited the Ohio Valley Military Society Gun Show in Norwood, Ohio, and observed the defendant with various firearms on display. They saw the defendant behind the table with 19 long guns and 9 handguns and saw people go by and look over the guns. One special agent bought a gun from the defendant "under the table." Then he bought

a gun (a Colt pistol) for $50 after showing his identification as a resident of Ohio. On one other occasion the defendant sold a gun to an undercover agent who identified himself as a Kentucky resident, after telling the agent he should get an Ohio Driver's License, and after being shown a fictitious Ohio driver's license.

The gun was sold to the agent under circumstances which show guilty knowledge in that the agent made the payment 35 to 40 feet from the table; the defendant laid down the gun under a holster and left, and the agent stopped by and picked up the gun and left. (See the photograph marked px 1–3.)

The guns in question have been test-fired and three out of four worked. They are not "antiques." All are semi-automatic revolvers.

So much for the government's case.

The defendant's testimony was pretty much in mitigation, though he denied being engaged in business and said that instead he is a collector. The defendant is a retired Navy veteran, 51 years of age. He has been retired since 1959 and said he collected guns since he was 17. He "showed" all except 10 or 15 of his guns at Washington, C.H. and Norwood. He said he is primarily a military collector, and most of the guns on the table were military rifles and handguns.

The defendant testified he made no money and this was a hobby. His wife was interested in antiques and he was interested in guns, so they went to the flea market in Washington, C.H. where he observed others selling guns from the back of cars, whereas he had his out on the table.

Defendant had no place of business, did not advertise in any way, including the Yellow Pages. He said he meant to apply for a collector's license. Further, defendant pointed out that until recently he was employed full time at the Post Office, from which he retired because he was apparently fearful that he would lose his job anyhow on account of this case.

The defendant called on his behalf John T. Weber, President of the Ohio Gun Collectors Association, who has known the defendant to be a member of such organization for four years. This witness testified that at the Ohio State Fairgrounds the Association of which he is president has as many as 1,000 tables and has as many as 750 at the Veterans Hall in Columbus. However, the members only make sales to each other.

Under the foregoing facts and the law, the Court must find and does find the defendant guilty as charged in the indictment.

CONCLUSION

■ The government correctly summarizes the evidence as showing multiple sales of firearms conducted regularly at gun shows on a continuing basis; the setting up of a glass display case; the displaying of numerous long guns and handguns, which are not curios or relics; the taking of orders for firearms; and the profit-making from the sale of such firearms. The government contends that these things are all characteristics reasonable men normally associate with a *bona fide* firearms business venture and more than sufficient to constitute being a "dealer" under Title I of the Gun Control Act of 1968.

We agree, and must therefore, and do, find the defendant guilty as charged in the indictment.

■■ In the hope that it will save others from a similar fate, and acquaint them with the intent of Congress, we conclude by noting with approval the following general statement in the government's brief (page 5):

"A firearms dealer is required to have a license issued in accordance with Chapter 44, Title 18, United States Code, before commencing business and he must pay a separate fee for each place of business. 18 U.S.C. 923(a). Additionally, a dealer must have appropriate business premises

from which to conduct such business or from which he intends to conduct such business within a reasonable period of time. 18 U.S.C. 923(d)(1)(E). See: 26 C.F.R. 178.11.

"A licensed dealer may attend a gun show and display his commodities but he may not conduct sales at the gun show unless he is licensed at that particular location. 18 U.S.C. 923(a). Because of the inadequacy of the facilities available at gun shows and the temporary nature of such shows, a firearms license is not issued for a gun show operation for want of appropriate 'business premises.' See: Rev. Rul. 69–59 . . . . The dealer is required to maintain accurate records of all firearms received and sold, 18 U.S.C. 923(g); 18 U.S.C. 922(m); 26 C.F.R. 178.125(e), and those records are subject to inspection during his normal business hours. 18 U.S.C. 923 (h); 26 C.F.R. 178.23. He may not sell firearms to prohibited classes of persons such as minors and convicted felons. 18 U.S.C. 922(b) & (d).

"It is through such controls that Congress has sought to curtail criminal activities in which firearms are used and to be able to more readily trace firearms which have been used unlawfully. Congress did not intend to place unnecessary restrictions on law-abiding citizens who may wish to dispose of a firearm in the state of his residence. Accordingly, an isolated sale in his home state would not place a citizen in the business of dealing in firearms, in the absence of other characteristics indicative of such business. However, the law-abiding citizen is prohibited from disposing of a firearm to a resident of another state. 18 U.S.C. 922(a)(5).

"A citizen is not prohibited from collecting firearms as curios or relics and he may be licensed as a collector, 18 U.S.C. 921(a)(13), 923(b), when he intends to regularly buy and sell firearms which are curios or relics. See: 26 C.F.R. 178.11."