**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Sterling HAMILTON, Scotty Hamilton, Anthony Bryan Salisbury and Earl Wayne Wright, Defendants-Appellants.**

**Nos. 81-5826, 81-5831, 81-5838
and 81-5839.**

United States Court of Appeals,
Sixth Circuit.

Argued June 16, 1982.

Decided Sept. 28, 1982.

Certiorari Denied Jan. 10, 1983.

See 103 S.Ct. 753.

Joseph Famularo, U. S. Atty., Thomas Self, Asst. U. S. Atty., Lexington, Ky., for plaintiff-appellee.

Before LIVELY and KEITH, Circuit Judges, and WEICK, Senior Circuit Judge.

WEICK, Senior Circuit Judge.

In the district court, the four defendants now before us on appeal were convicted by a jury and sentenced for conspiring to engage in the business of dealing in explosives without a federal license in violation of 18 U.S.C. Section 371. Three of the defendants Earl Wright, Anthony Salisbury and Sterling Hamilton, were also convicted and sentenced on the underlying substantive offense, pursuant to 18 U.S.C. Section 842(a)(1), and on various other violations of 18 U.S.C., Chapter 40 (Importation, Manufacture, Distribution and Storage of Explosive Materials). For the reasons set forth herein, we affirm the judgments of conviction.

I.

Taking the view most favorable to the government, *Glasser v. U. S.,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1941), in considering the sufficiency of the evidence, and the inferences drawn therefrom, the following facts were revealed: In March of 1980, Earl Wayne "Mussie" Wright approached Birchel Reid about making some money by stealing a mining scoop and selling it to Sterling Hamilton, a small coal operator in Kentucky. Reid agreed. Hamilton was told that the equipment was available from a mine that was going out of business and Hamilton indicated he would buy the scoop. Reid and Wright took one of Hamilton's employees to inspect the machine, but that nighttime excursion was abruptly terminated when a watchman fired a shot into the air from behind a locked gate at the site. Consequently, alternate plans were devised and Hamilton agreed to purchase a load of explosives instead. Sixty cases of dynamite and twelve cases of electric blasting caps were stolen from the storage trailers of Elkhorn Explosives, Inc., in Floyd County, Kentucky, and were delivered in Wright's truck, in three loads, to Sterling Hamilton at his home between one a. m. and dawn on the night of March 27, 1980. Hamilton paid the two a total of $1500, $20 a case for the dynamite (worth $25 a case) and $25 a case for the caps (worth $395 a case). So Hamilton paid $1500 for this shipment that was reasonably worth about $6,240. The transaction was all in cash. All of this proves conclusively that Hamilton knew the shipment was stolen. Hamilton also knew he was not purchasing the explosives from a licensed dealer.

In mid-April Wright and Reid visited Hamilton again and he ordered an additional hundred cases of dynamite for $1500, five dollars less a case than the first order. This time the dealing was more straightforward. Hamilton was informed that the "powder", as it is referred to in the trade, might be "hot". He replied, "I don't give a damn if it's so hot it blows up before I get it inside the mines.... You know you are dealing with the Federal." Wright countered, "We

know." There was no representation this time that the powder was surplus from a defunct mine.

A few days later, Reid and Wright talked with Anthony Salisbury, who indicated that he wanted to make some fast money. Reid and Wright were willing to accommodate him and eventually Salisbury, at a meeting in an empty trailer he owned, agreed to participate in the heist. In order to maintain a healthier profit margin for themselves, however, the original partners told Salisbury that Hamilton was only offering $1000 for the hundred cases of powders. James E. Turner, Jr., a co-defendant who was eventually acquitted, was also allegedly part of this second scheme. Turner was to receive only $60 for being a "helping hand". The prior theft was not mentioned at first to the new accomplices and Salisbury was not so informed, much to his concern, until the evening of the heist.

On April 27, Wright's girlfriend rented a large truck for the venture with a hundred dollars advanced by Hamilton for that purpose. That night, Reid, Wright, Salisbury and Turner broke into Elkhorn Explosives and made off with 200 cases of dynamite. (Turner, described as "a little guy", turned out to be a helping hand indeed as he handled the majority of the fifty pound cases.) One hundred of the cases were kept in reserve in Salisbury's trailer with the intent that they could be sold later to Hamilton, the other hundred were then delivered to Hamilton, again at his home. No payment was received for this shipment, although Hamilton had promised that he would give the men cash when payday came at his mine.

The reserve cache remained at Salisbury's only three or four days before it was transferred to a nearby hollow, partially because the "heat was coming down pretty heavy" and partially because Salisbury wanted to move into his trailer and the weight of the dynamite had been buckling its floors. The hollow turned out to be an improvident hiding place, however, as the cases were discovered there the very next day, by a man picking "polk berries", and were turned over to the State Police and to the United States Treasury Department, Bureau of Alcohol, Tobacco and Firearms (ATF). Reid's fingerprints were discovered on one of the cases, which led to his arrest on July 18, 1980, and to his three-count, grand jury indictment on July 23, 1980.

After his indictment, Reid and his attorney entered a plea bargain agreement with the United States Attorney, whereby the government agreed to drop two counts and allow Reid to enter a guilty plea for only the charge of improper storage of explosives in exchange for his cooperation in the government's investigation of this case. Reid consented to be "wired" for future conversations with Hamilton, Wright and Salisbury, to provide evidence for the government. On August 9, Reid gave a formal statement to ATF agent Dennis McCallister, who would later have his secretary type it from his notes and memory for Reid's signature. On August 14, Reid talked with Salisbury and Hamilton, as well as with Hamilton's son Scotty, Hamilton's partner in the mine. On August 26, Reid had his conversation with Wright. On that same day Reid also signed his typewritten statement, after making minor corrections on it. (This was the first date that McCallister had a chance to return to Pikeville from his office in Ashland after the statement was typed.) All the conversations with Reid's former partners were taped on a small recorder hidden on Reid's person; he was also fitted with a microphone and assembly that transmitted his conversations to McCallister and other agents in a vehicle nearby. On September 11, 1980, Reid entered his guilty plea.

Although the government gave Reid tips on how best to obtain admissible evidence, he claimed he used largely his own innovation. Regardless, the fishing expedition proved to be more successful than anticipated, for on Reid's initial outing he encountered Scotty Hamilton while expecting only to meet Scotty's father, Sterling Hamilton. Scotty effectively cooperated as he brought up the topic of the explosives himself and in fact ordered sixty cases of dynamite and

some blasting caps for a Saturday night delivery, on a cash basis, without any prompting from Reid. Scotty revealed knowledge of the prior dealings and said, regarding the government authorities, "we can't let them know." Before Reid would head for other subjects, Scotty said that he and his father would take almost any kind of mining supplies and added "we'll give you the green when youn's put her over. Might save us a lot of money and that puts money in your guys pocket."

Scotty left the scene as his father entered it. Hamilton, a self-starter much like his son, also brought up business on his own initiative. Reid introduced the matter of money due for the second delivery of powder, but Hamilton contended, amid recountings of the past transactions and events, that Wright and Salisbury had received all the money and that he had even paid Wright an extra hundred dollars "when he was hidin out." Hamilton also volunteered that Wright and Salisbury were to have delivered a two ton electric chain horse the previous Friday. He continued, concerning the more recent transaction, "I don't know whether you was involved in that or whether, but they didn't bring it though now . . . . So they wanted some money and I said now hoss, just bring it over and I'll give ya cash. Cause we're operatin on cash basis". Hamilton continued, "So if you bring me dynamite, . . . when you unload, cash." He stated that the previous loads had all been used, that every "box was burnt and there's no proof, there's no evidence", and that he was willing to buy additional mining supplies of most any sort.

With that productive outing under his belt, Reid visited Salisbury later the same evening. In response to Reid's query about money, Salisbury stated, among other things, that he never received any for his part in the deal and that he felt it was either uncollectable or that Wright had the money and was pulling a fast one. However, Salisbury did say that he would go see Hamilton to try to get some of the money for all his trouble.

After a twelve day respite, Reid approached his remaining target and dangled, before Wright, Hamilton's assertion that Wright receive the money for the second delivery of explosives. Wright denied that and suggested they all confront Hamilton together to collect their money. He even suggested to Reid an alternative means of collection: "I'll grab ahold of the little scrawny _____ and choke him and you grab his billfold in his pocket while I'm holdin him there." Wright's plans and manner of discourse were imbued with a great sense of urgency, but Reid managed to postpone their direct confrontation with Hamilton.

On the basis of the foregoing, the grand jury returned an eight-count indictment charging the Hamiltons, Wright, and Salisbury, along with James E. Turner, Jr., and Wright's girlfriend, Joyce Hall, with violations of 18 U.S.C. 371 (conspiracy to commit an offense against the United States, in this case engaging in the business of dealing in explosive materials without a federal license) and of various substantive offenses under 18 U.S.C., Chapter 40 (explosive materials).

Trial as to all the original defendants began on August 18, 1981, and ended on August 19, 1981. The jury acquitted Salisbury on one count and Sterling Hamilton on two counts of improper storage of explosives (18 U.S.C. 842(j)). It acquitted Scotty Hamilton of the substantive offense of dealing in dynamite without a license (18 U.S.C. Section 842(a)(1)). It acquitted Mary Joyce Hall on all counts. The jury however could not decide as to the remaining defendants on the remaining counts, and a mistrial was declared. A superseding indictment was returned on September 8, 1981, eliminating the defendants and counts to which not guilty verdicts had been returned.[1]

---

1. In the superseding indictment the defendants were charged with violations of Title 18 of the United States Code as follows: in Count I,

Wright, Salisbury and the Hamiltons were charged with conspiracy under Section 371; in Count II, Wright, Salisbury and Sterling Hamil-

The trial on the superseding indictment began October 19, 1981, and ended with verdicts of guilty as to all defendants on all counts except for Turner, who was acquitted. These appeals followed.

## II.

■ The most serious argument presented by the defendants on appeal is that the trial court erroneously admitted the taped conversations against all the defendants under the so-called "coconspirator exception" to the hearsay rule.[2] It is well established "that, before the government can take advantage of the coconspirator exception to the hearsay rule, it must show by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy and, (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." *U. S. v. Vinson,* 606 F.2d 149, 152 (6th Cir. 1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), following *U. S. v. Enright,* 579 F.2d 980 (6th Cir. 1978). No defendant disputes that his own statement would be admissible against himself as an admission, but each argues that the statements fail to meet the third criterion above, arguing no statement was made *either* during the course of *or* in furtherance of the conspiracy and concluding that no declarant's statement should have been admitted against any of that declarant's co-defendants. We will examine each prong of that argument separately.

ton were charged with engaging in the business of dealing in explosives without a license under Section 842(a)(1) and under Section 2(a) (aiding and abetting); in Count III, Wright and Sterling Hamilton were charged, relative to the first theft, with handling explosives reasonably known to be stolen in violation of Section 842(h); in Count IV, Wright, Salisbury, Sterling Hamilton and Turner were charged, relative to the second theft, with handling explosives reasonably known to be stolen in violation of Section 842(h) and Section 2(a); and, in Counts V and VI, Wright was charged with wrongful receipt by a felon of explosives transported in interstate commerce under Section 842(i)(1), one count for each receipt of explosives.

2. Rule 801 of the Federal Rules of Evidence, Title 28 U.S.C., defines hearsay. Statements of

## A. During the Course

The defendants first contend that, because of the "heat" put on by the government investigation, the last overt act of the conspiracy occurred in late April or early May of 1980, almost four months prior to the taped conversations. They also contend that no one really expected to be paid by the time Reid solicited the dialogues and that there was a total lack of proof that there were any further plans to steal explosives. On these bases, they urge that the statements could not have been made "during the course" of the conspiracy. But this argument fails.

■ "[W]here a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *U. S. v. Mayes,* 512 F.2d 637, 642–643 (6th Cir.), *cert. denied,* 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975) citing *U. S. v. Etheridge,* 424 F.2d 951, 964 (6th Cir. 1970). The objective of Reid, Wright and Salisbury was to make some easy money, while that of the Hamiltons was to obtain explosives inexpensively. The method for achieving those ends was by the former group stealing dynamite and blasting caps and selling them cheap to the latter. The two deliveries and stored re-

coconspirators are specifically excluded from that definition: "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." 801(d)(2)(E). For a general discussion of that rule, see, e.g., *U. S. v. Eubanks,* 591 F.2d 513, 518–521 (9th Cir. 1979) and *U. S. v. Smith,* 578 F.2d 1227, 1231–1232 (8th Cir. 1978). *See also* the Historical Note and the Advisory Committee Notes to that Rule. While technically coconspirator statements are not "exceptions" to the hearsay Rule 802, they are in practice indistinguishable from the exceptions listed in Rules 803 and 804. The distinction is termed "semantic" by the *Smith* Court, *id.* at 1231 n. 6.

serves show there was a continuity of purpose and a continued performance. This is further supported by Hamilton's disclosure that he had continued dealing with Wright and Salisbury, which he thought may have included Reid, even as late as August of 1980.[3] Even while recognizing that the heat had been on, both Scotty and Hamilton ordered additional explosives, also in August, essentially without any prompting from Reid, which evidenced their impression that the arrangement was a continuing one, that it was just business as usual, an impression which would be improper for us to distrust or discount. Wright and Salisbury made plans to collect the money due them, which also proves the ongoing nature and existence of this conspiracy. Moreover, the defendants utterly failed to affirmatively prove either that the conspiracy had been abandoned or that any of them had withdrawn. Such affirmative defenses are strict. *U. S. v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). It is also most difficult for them to prove when, as here, the defendants exercise their right to not testify.

### B. In Furtherance

The defendants more vehemently insist that their conversations were not "in furtherance" of the conspiracy. They argue that the discussions actually had the contrary effect of furthering the *government's* investigatory and prosecutorial ends. Certainly Reid had no intention of furthering the conspiracy and, they argue, no one had any intent of stealing more explosives after April of 1980. With respect to the orders placed by the Hamiltons, it is argued that the transactions could have no effect on Wright or Salisbury since Reid was no agent of theirs after his arrest and since his arrest made Reid incapable of filling those orders. With respect to the Wright and Salisbury conversations, the contention is

repeated that there was no genuine intent to collect money but rather their discussions were idle conversations skillfully generated by Reid, a coached government agent.

 The defendants' arguments do not further their aims, however. We made it clear in *U. S. v. Thompson,* 533 F.2d 1006, 1010 (6th Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976), that where, as here, the unarrested coconspirators are still capable of perpetuating the ongoing conspiracy, the statements made by them to the arrested conspirator are admissible for Rule 801(d)(2)(E) purposes, even when the arrested conspirator was acting "under the direction and surveillance of government agents to obtain evidence against the coconspirators". Citing *U. S. v. Cohen,* 197 F.2d 26, 29 (3rd Cir. 1952); *accord, U. S. v. Testa,* 548 F.2d 847, 852 (9th Cir. 1977), citing *U. S. v. Bennett,* 409 F.2d 888, 893–894 (2d Cir. 1969); *see also U. S. v. Register,* 496 F.2d 1072, 1079 (5th Cir. 1974), *cert. denied,* 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819 (1975), and *U. S. v. Sarno,* 456 F.2d 875, 878 (1st Cir. 1972). This is buttressed by the principle that "it is no defense that success was impossible because of unknown circumstances." 16 Am.Jur.2d 225 (2d ed. 1979). The practical effect, for this issue, is that Reid was still a full partner in the venture and, when seen in this light, the conversations were clearly a furtherance thereof. It is simply one of the risks engaged by conspirators that one amongst them may turn government agent and that future conversations with him may return to haunt them. Having taken that risk, they cannot now complain after finding out Reid's true function as an individual cooperating with the government in its investigation and after damaging conversations were introduced at trial. *Cf., U. S. v. Craig,* 573 F.2d 455, 477 (7th Cir. 1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 110 (1978), *Hoffa v. U. S.,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). We thus turn to the nature of those conversations.

---

**3.** "[T]he hearsay statements themselves may be considered by the judge in deciding the preliminary question of admissibility." *Vinson, supra,* 606 F.2d at 153. As a conspiracy may be proven circumstantially, *Glasser, supra,* it follows that its enduring nature may also be proven circumstantially. Furthermore, mere passage of time does not fragmentize a single conspiracy. *U. S. v. Cianchetti,* 315 F.2d 584, 592 (2d Cir. 1963).

Nothing is more clear than that the orders placed by the Hamiltons were in furtherance of the conspiracy.[4] The same goals were furthered in exactly the same manner as previously done. Even mere assurances to coconspirators that one has an outlet for their goods has been held to be in furtherance of the conspiracy. *U. S. v. Scholle,* 553 F.2d 1109, 1119 (8th Cir.), *cert. denied,* 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977). *See also U. S. v. Thompson, supra; cf. Direct Sales Co. v. U. S.,* 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943), and *U. S. v. Borelli,* 336 F.2d 376, 384 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965).

■■■■■ The remaining conspirators had different ends differently furthered. It is academic that to be a party one must have *some* stake in the conspiracy, but that each party need not have the *same* stake; merely acting for the venture's success is sufficient. 15A C.J.S. 724 Conspiracy § 35(1) (1967). *Cf., U. S. v. Perry,* 643 F.2d 38, 45 (2d Cir. 1981), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (a single conspiracy may have more than one criminal object). So there is no contradiction in the Hamiltons not having interests identical with the remaining conspirators. Reid, Wright and Salisbury were in the scheme solely to make money. This is apparent not only in Reid's testimony but also in the statements of both the Hamiltons, so any allegation that making money was not a conscious purpose of the conspiracy, but was a government-induced fabrication, is without merit. The case law gives ample support to the proposition that payment is an integral and often final term in a conspiracy. *Direct Sales, supra,* 319 U.S. at 713, 63 S.Ct. at 1270; *U. S. v. Hickey,* 596 F.2d 1082, 1089–1090 (1st Cir.), *cert. denied,* 444 U.S. 853, 100 S.Ct. 107, 62 L.Ed.2d 70 (1979); *U. S. v. Smith,* 578 F.2d 1227, 1233 n. 12 (8th Cir. 1978); *Testa, supra,* 548 F.2d at 852. *See also* 15A C.J.S. 725–726 (1967). Thus the conversations with Wright and

Reid clearly furthered the conspiracy's explicit ends, making plans to collect money due.

■■■■■ Additionally there is nowhere proposed, as the defendants would have it, that the statements must *actually* further the conspiracy to be admissible. Rule 801(d)(2)(E) explicitly says statements need be "in furtherance of the conspiracy", not that they "further the conspiracy". It is enough that they be intended to promote the conspiratorial objectives. *U. S. v. Fielding,* 645 F.2d 719 (9th Cir. 1981), provides no assistance for the defendants. The Ninth Circuit observed that "[o]rders from one conspirator to the other to stop using heroin so that he could be 'cleaned up' enough to distribute the drug, or the actual negotiation of a sale, 'furthered the objectives of the alleged conspiracy because *they set in motion transactions that were an integral part of the heroin distribution scheme.*'" *Id.* at 726 (emphasis added by the *Fielding* Court; citations omitted). Actual furtherance was not designated as a new and additional criterion of admissibility; the Court was merely providing a very clear example for distinguishing that *type* of statement from those not intended to promote further conspiratorial ends, such as where one "was merely informing his common-law wife about his activities." *Id.* at 727. It is also contended that here, as in *Fielding,* there were arguments over money past due, so that there would be no furtherance of the conspiracy where "the conspiracy . . . had degenerated into after-the-fact internecine quarrels and beliefs of betrayal." *Id.* But the situation there was extreme, as extra men were enlisted as "muscle" and use of a machete was considered, while here plans were made for essentially a verbal confrontation. Furthermore, as the conspiracy here was so close-knit, cooperative payment would appear integral to its continuance. In any case, we recognize that where the admissibility of the coconspirators' statements presents a close call we should not

---

4. The orders, of course, constitute verbal acts and would not be hearsay at all and hence would be unaffected by the coconspirator rule.

*See, e.g., U. S. v. Fried,* 576 F.2d 787, 792–793 (9th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978).

disturb the district court's finding. *U. S. v. Provenzano,* 620 F.2d 985, 1001 (3rd Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

Finally it is significant to reiterate that no defendant disputes that his own conversation would have been properly accepted into evidence as an admission. The further acceptance of the conversations as statements of coconspirators, even were that improper, would not necessarily require reversal, especially where the government's case is a strong one and where their use against coconspirators is largely cumulative. *Cf. Smith, supra,* 578 F.2d at 1233–1234, and *Lutwak v. U. S.,* 344 U.S. 604, esp. at 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953). Here, in addition to Reid's testimony, the admissions and adoptive admissions of the defendants were sufficient to show that each defendant had knowledge of the operation and its nature and revealed each one's voluntary participation in it. Each defendant effectively hung himself and, as the statements of his coconspirators were essentially consistent, corroborative and cumulative, they simply provided more rope.[5]

### III.

Wright and Salisbury were convicted on Count II of the superseding indictment of the substantive offense of engaging in the business of dealing in explosives without a license in violation of 18 U.S.C. 842(a)(1), while Hamilton was convicted on that substantive count as an aider and abettor in violation of 18 U.S.C. 2(a). They now argue that the activities they were engaged in could not in any respect be considered "dealing" so as to violate the said statutes.

No court to our knowledge has delineated what constitutes being engaged in the business of dealing in explosives under the federal statute, although guidance can be provided, as all parties herein agree, by cases construing a parallel statute proscribing dealing in firearms without a license, 18 U.S.C. 922(a)(1). In that regard, our Court has adopted the meaning of dealer to be "one that is engaged in any business of selling ... firearms and that business is that which occupies the time, attention and labor of the man for the purpose of livelihood or profit." *U.S. v. Day,* 476 F.2d 562, 567 (6th Cir. 1973). In *Day* we found it sufficient for conviction that "[t]he evidence show[ed] that four separate sales over two months [totaling seven handguns] were made by Day to the Government agent. Day admitted ... to at least one other sale. Ninety-six guns [worth $12,-000], including 60 in their original packages, were found in the search of [his] house. [The] Government agent testified that ... Day told him he could get any kind of gun he wanted." *Id.* Although there was no mention of the dollar amount involved in the sales to the agent in *Day,* the figures above indicate the average market value of the guns the defendant possessed was about $125 per gun ($12,000 ÷ 96 guns), so that the value of the guns in all the transactions can be approximated at $1000 ($125 × 8 guns). We can assume the actual price was discounted appropriately for "street" sales.

In our case, initially there were two transactions occurring in a little over two month's time; those dealings involved the delivery of 160 cases of dynamite and twelve cases of blasting caps for an agreed

---

5. The tapes were edited by the court. Salisbury at a pretrial conference wanted to be able to play other portions of the Reid/Salisbury conversation because they were helpful to his case. Salisbury and the government finally agreed on a version which included the portion Salisbury wanted included, and this version was finally played to the jury.

Defendants also argued on appeal that as no coconspirator elected to testify at trial, the admission of the tapes deprived each of his constitutional right to confrontation, citing *Bruton v. U. S.,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d

476 (1968). However, as this court pointed out in *U. S. v. Kendricks,* 623 F.2d 1165, 1167–1168 (6th Cir. 1980), *Bruton* was limited to inadmissible statements and was motivated by a concern over the credibility of confessors. "Thus, *Bruton* does not prohibit the use as evidence of co-conspirators' statements against other co-conspirators. *See United States v. Archbold-Newball,* 554 F.2d 665, 667 (5th Cir.), *cert. denied,* 434 U.S. 1000, 98 S.Ct. 644, 54 L.Ed.2d 496 (1977)." *See also Scholle, supra,* 553 F.2d at 1119–1120.

price of $3,000, but at a market value of almost $7,000 ($25 per case for the dynamite and $395 per case for the blasting caps). There was also an additional hundred cases of dynamite, stock in reserve, worth another $2,500. The number of transactions over a period of time, the reserve of stock, the quantity of units involved and the monetary value all compare favorably with *Day* so that we can comfortably conclude that the evidence was sufficient to support the convictions. Yet there is even additional supportive evidence. The Hamiltons were ordering more explosives four months after the transactions above, with mention that there were other business dealings amongst the conspirators during the interim. And there was an implication that the defendants' deliveries were to order, as Hamilton said he would only accept 30 and 36 inch bolts, "that's the only kinda bolts I buy".

The evidence presented also fully comports with the alternate criteria for proving guilt of dealing in firearms (in explosives, for our purposes) used in our Circuit in *U. S. v. Jackson,* 352 F.Supp. 672 (S.D.Ohio), *aff'd without op.,* 480 F.2d 927 (6th Cir. 1972): "we conclude that anyone is engaged in the business of dealing in firearms if they have guns *on hand or are ready and able to procure them,* in *either* case for the purpose of selling some or all of them to such persons as they might from time to time conclude to accept as customers." 352 F.Supp. at 674 (emphasis added).[6] While this is set in the alternative, both disjuncts are satisfied by the facts before us.

 Salisbury makes the additional argument on his behalf that he could not be guilty of dealing as he was involved in only one sale and was not originally told there had been a prior interchange with Hamilton. He claims that "a single sale, without more, would not have been sufficient to establish a violation.... While [it is possible to] conceive of a single transaction sufficiently large enough in number of guns

and the price paid to constitute engaging in the business of dealing in firearms, ordinarily one sale will not be sufficient to meet the statutory requirement." *U. S. v. Tarr,* 589 F.2d 55, 59 (1st Cir. 1978); our emphasis. While the second transaction itself may have been sufficiently large in number and price to satisfy the *Tarr* standards, Salisbury's involvement had that "something more" that distinguishes his situation from the single transaction. He admitted he knew of the prior dealing by the night of the second theft, so he knowingly joined the clandestine distributorship, unlike *Tarr* where "there was no evidence that the appellant had knowledge of [his associates'] activities at other times and places." *Id.,* at 60. Salisbury even provided his trailer for their warehouse so the venture was able to have explosives "on hand", in violation of *Jackson, supra.* Furthermore, as we noted in *U. S. v. Renfro,* 620 F.2d 569, 575 n.5 (6th Cir. 1980), the single-sale defense applies only in two situations, neither applicable here: (1) when the buyer and seller are the only two participants and (2) where the buyer is a minor figure in a complex conspiracy so as to raise questions of whether he knew of the scope of the conspiracy.

 We also find no sympathy for Wright, who contends that he was not able to be in the business of dealing as he was in the unfortunate position of having "to steal the dynamite before it could be sold." (Wright Brief at p. 11.) And Hamilton's contention that he was not an aider nor an abettor is simply without merit. "In order to aid and abet another to commit a crime it is necessary that the defendant 'in some sort associate himself with the venture, that he participate in it as in something he wishes to bring about, that he seek by his action to make it succeed' [or that he] 'must know that the activity condemned by the law is actually occurring and must intend to help the perpetrator.'" *Tarr, supra,* 589 F.2d at 59 (citations omitted). Hamilton certainly wanted to see the venture succeed

**6.** The Fifth Circuit has also adopted this as an alternative in *U. S. v. Wilmoth,* 636 F.2d 123, 125 (1981): "*It is enough* to prove that the accused has guns on hand or is ready and able to procure them...." Emphasis added.

as his various activities amply demonstrate; he even advanced a hundred dollars for the truck rental to ensure his own interest in the operation.

## IV.

The defendants next challenge the trial court's decision to permit, pursuant to Fed. Rule of Ev. 801(d)(1)(B), Reid's statement to be read into evidence, although the court did not permit it to be taken by the jury into deliberation. Rule 801(d)(1)(B), in pertinent part, reads "A statement is not hearsay if ... [t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive". The statement here comports precisely with the literal terms of the Rule. Reid testified at trial, counsel for acquitted defendant Turner cross-examined him as to the statement which as signed was consistent with his testimony, and it was offered to rebut at least implied charges of recent fabrication or improper influence or motive. Turner's counsel brought out the fact that Reid did not sign the statement until seventeen days after he gave it and also indicated there was recent fabrication in that Reid's testimony at trial included elements not mentioned in the statement, a statement intended to be complete and nearer in time to the actual events. He also implied that Reid's account was influenced by his deal with the government, an implication reflected in the questioning of other defense counsel too.

A wide variety of circuits have held that a charge of recent fabrication or improper motive need not be express. *U. S. v. Baron*, 602 F.2d 1248, 1253 (7th Cir.), *cert. denied*, 444 U.S. 967, 100 S.Ct. 456, 62 L.Ed.2d 380 (1979), and cases cited therein. The *Baron* Court even provided that "[t]he fact that defense counsel may not have intended to imply that [defendant's] story was fabricated [recently] is irrelevant if that inference fairly arises from the line of questioning he pursued." *Id.* Where credibility has been challenged on the basis of facts *absent* from the prior statement, the statement has been admitted when it was consistent with the remaining testimony. *U. S. v. Lombardi*, 550 F.2d 827 (2d Cir. 1977). Broad discretion is given to the trial court regarding the admission of prior consistent statements. *U. S. v. Mock*, 640 F.2d 629, 632 (5th Cir. 1981); *U. S. v. Goodson*, 502 F.2d 1303, 1307 (5th Cir. 1974).

But defendants' main allegation of error here concerns a criterion not explicitly provided in Rule 801(d)(1)(B). They contend that prior consistent statements are inadmissible if they are made after the "supposed motive to falsify arose", relying principally on *U. S. v. Quinto*, 582 F.2d 224, 232 (2d Cir. 1978), and they argue that Reid's motive to falsify was already existent when he gave his statement on August 9, several weeks after his arrest and indictment and during the period when he was plea bargaining with the government. However, they fail to recognize that although being prior in time to a motive to falsify may affect a statement's *materiality, U. S. v. Weil*, 561 F.2d 1109, 1111 (4th Cir. 1977), it is not a hard and fast rule for admissibility under Rule 801(d)(1)(B). In fact the Fifth Circuit has repeatedly and vigorously rejected such a limitation on that Rule. *U. S. v. Parry*, 649 F.2d 292, 296 (5th Cir. 1981), *U. S. v. Williams*, 573 F.2d 284, 289 (5th Cir. 1978); *U. S. v. Gandy*, 469 F.2d 1134 (5th Cir. 1972). The Seventh Circuit considers the question as one of relevancy under Rule 402, it suggests that whether the motive to falsify existed at the time of the statement may well be a question for the jury to decide, and it notes that, where the danger of unfair prejudice outweighs the probative value of the evidence, Rule 403 is available. *Baron, supra*, 602 F.2d at 1252–1253.

While our Circuit has not directly ruled on the issue, we have indicated our desire for a more relaxed standard of admissibility under Rule 801(d)(1)(B) and our uneasiness with the *Quinto* decision. *U. S. v. LeBlanc*, 612 F.2d 1012 (6th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980).

**1274**

While the Court in *LeBlanc* decided the Rule 801 issue on procedural grounds, for failure to properly preserve the question for review, the panel went to the additional effort of distinguishing *Quinto* on the facts. The very first three distinctions listed in *LeBlanc* are equally applicable here: "First, the statements were only read ... not allowed to go to the jury room during its deliberations. [The *Quinto* Court found it significant that a copy of the challenged statement was permitted in the jury room.] Secondly, defendant himself elicited the use of the statement ... by his reference to [it] ... on cross-examination. Further, throughout the trial, counsel argued, by inference, that [the witness] should not be believed because of the favorable consideration he received from the government in his plea bargaining agreement." *LeBlanc,* at 1017. The trial court below in fact expressly relied on our implicit directive in *LeBlanc* when it allowed the statement to be read into evidence but refused to permit the jury to take it with them during the deliberation.

 The case before us can be even further distinguished from *Quinto* by its rather unique factual setting. As we noted above, the temporal sequence of the statement and of the declarant's motive to falsify presents a question of relevancy, which was recognized even in the *Quinto* opinion upon which the defendants so heavily rely. The *Quinto* Court asserted that historically prior consistent statements were admissible only where they preceded the motive to falsify because "[o]nly then was the prior consistent statement 'relevant' on the issue of credibility; that is, it tended to make the trustworthiness of the witness's in-court testimony more probable, after that testimony had been assailed, inasmuch as the consistency of the prior statement with the witness's testimony at trial made it 'appear

that the statement in the form now uttered was independent of the [alleged] discrediting influence.' " 582 F.2d at 232–233 (citations omitted). In our case, there are factors which make it appear that Reid's statement was independent of the alleged discrediting influence and so these function to make the trustworthiness of his in-court testimony more probable. The admissions and adoptive admissions of the defendants, recorded *after* Reid gave his statement were *consistent with* and *corroborated* Reid's statement.[7] Hence the underlying rationale for the temporal-priority condition has been complied with here, so that Reid's statement was relevant and its admission certainly proper even under this more rigorous standard.

 However, even if Reid's statement were inadmissible under Rule 801(d)(1)(B), many of the same factors mentioned above convince us that any error would have been harmless beyond a reasonable doubt. *U. S. v. Guevara,* 598 F.2d 1094, 1100 (7th Cir. 1979); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The statement itself contained nothing substantially new; it was consistent with and corroborated by not only Reid's in-court testimony but also by the defendants' admissions which followed Reid's statement in time. By not being taken into the jury room during deliberation, the statement asserted no undue influence on the jurors. Additionally, it was Turner's defense counsel that elicited its use. Neither its form nor its content were unfairly prejudicial.

In view of the above, we consider to be without merit the argument that even if the statement were admissible as to Turner, it should not have been admitted against the other defendants. We note, however, the trial court's observation that if one defendant attacked the witness's credibility all the other defendants would benefit.[8]

7. Nothing in the record would seriously support an allegation that the government had Reid alter his statement to fit the evidence supplied by the recordings before he signed it on August 26, 1980, and no defendant so contends.

8. Counsel for the Hamiltons admitted that to *some* extent he relied on Reid's credibility, so it seems that the inclusion of Reid's statement would possibly have benefited them. Furthermore, their counsel declined to offer a corrective admonition, contending any defect could not be cured.

## V.

The remaining arguments of the defendants are easily disposed of. Despite Scotty Hamilton's contentions, there was ample evidence to convict him of conspiracy. "Once the existence of a conspiracy has been established, only slight additional evidence is required to connect a particular defendant with it." *U. S. v. Smith,* 561 F.2d 8, 12 (6th Cir. 1977), *cert. denied,* 434 U.S. 958, 972, 1019, 1048, 98 S.Ct. 487, 524, 741, 897, 54 L.Ed.2d 317, 461, 766, 800 (1977), citing *U. S. v. Chambers,* 382 F.2d 910 (6th Cir. 1967). Scotty and Reid talked about the "heat" being on after "that last haul" but that things had cooled down; subsequently Scotty put in an order for a Saturday night, cash delivery of more explosives which "[m]ight save us a lot of money and that puts money in your guys pockets." While even circumstantial evidence is sufficient to support a conviction for conspiracy, the evidence here plainly shows that Scotty knew of the conspiracy and voluntarily became a participant in it.

Wright and Salisbury contend that the trial court erred in not granting their motions for severance of their trials. Their argument, however, is premised upon the inadmissibility of the taped conversations against the nondeclarant conspirators and subsequent *Bruton* violations, all of which was disposed of above. But we also take note of the following principles governing severance:

The question of whether charges that have been properly joined out to be severed for trial is for the discretion of the trial judge, whose decision will be reversed only upon a showing of clear abuse. *United States v. Tanner,* 471 F.2d 128, 137 (7th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). The defendant has the burden of showing prejudice, which is a difficult one. *Id.* A denial of severance will rarely be reversed on review, *Tillman v. United States,* 406 F.2d 930, 935 (5th Cir.), *cert. denied,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969), and then only for the most "cogent reasons," *United States v.*

*Kahn,* 381 F.2d 824, 838 (7th Cir.), *cert. denied,* 389 U.S. 1015, 88 S.Ct. 591, 19 L.Ed.2d 661 (1967). There is, moreover, a strong policy in favor of joint trial "where the charge against all the defendants may be proved by the same evidence and results from the same series of acts." *United States v. Cohen,* 124 F.2d 164, 165 (2d Cir.), *cert. denied sub nom. Bernstein v. United States,* 315 U.S. 811, 62 S.Ct. 796, 86 L.Ed. 1210 (1942). *See also United States v. Echeles,* 352 F.2d 892, 896 (7th Cir. 1965) recently quoted in *United States v. Harris,* 542 F.2d 1283, 1312 (7th Cir.), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1976).

*United States v. McPartlin,* 595 F.2d 1321, 1333 (7th Cir. 1979).

Finally, we reject the Hamiltons' contentions that their Sixth Amendment rights to counsel were violated by, they allege, the government deliberately enticing incriminating statements, citing *U. S. v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). This issue was not properly preserved for appeal, as the Hamiltons neither raised the issue below nor designated it as an issue they intended to raise on appeal. However, we note that the *Henry* Court distinguished cases like ours from defendant Henry's situation, stating "It is quite a different matter when the Government uses undercover agents to obtain incriminating statements from persons not in custody but suspected of criminal activity prior to the time charges are filed." *Id.,* at 272, 100 S.Ct. at 2187. The Court further found it significant that "Henry was in custody and under indictment at the time he was engaged in conversation with [the government agent]", *id.* at 270, 100 S.Ct. at 2186, factors not present here. And while the agent in *Henry* "was ostensibly no more than a fellow inmate," *id.,* the Hamiltons were coconspirators of Reid's, and they raised the subject of the matter under investigation themselves, unlike *Henry. Id.,* at 271–272, 100 S.Ct. at 2187–88. As we noted above, such are the risks of their enterprise.

The judgments of conviction are affirmed.